484 A.2d 1023

**Harland W. SANDERS**

v.

**James Joseph ROWAN, et al.**

**No. 320, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

Dec. 10, 1984.

Howard E. Goldman, Laurel (Richard I. Kovelant and Goldman, Nichols, Kovelant, Hurtt, & Kruger, Laurel, on brief), for appellant.

Douglas G. Worrall, Baltimore (Smith, Somerville & Case, Baltimore, on brief), for appellees.

Argued before WILNER, BISHOP and GARRITY, JJ.

WILNER, Judge.

Literature abounds with tales of look-alike people exchanging places, each wittingly or unwittingly posing as or simply being taken for the other. The results range from the farcical (*The Comedy of Errors,* Shakespeare) to the adventuresome (*The Prince And The Pauper, Puddinhead Wilson,* Twain) to the heroic (*A Tale Of Two Cities,* Dickens).

This case presents a variation on the theme. It involves not people, but horses; the result is neither farcical, nor adventuresome, nor heroic, but economic.

Harland W. Sanders, appellant, is an experienced breeder and owner of thoroughbred horses. He started in the business in 1970; trading as Quality Hills Stables, he is licensed in eight States, including Maryland. He has had twenty or more horses in his stable at given times and in 1975, 1976, and 1977, ranked within the top fifteen stables nationally in terms of wins.

In 1976, Sanders acquired a thoroughbred stallion named Dare to Command; in 1977, he acquired another thoroughbred stallion named Large as Life. Except for a triangular white snip on the nose of Dare to Command, the two horses looked alike; they were both chestnut in color and were about the same size, although Sanders said that Dare to Command was more "robust." The look-alikes were not alike in ability or value, however, and therein lie the seeds

of this controversy. Dare to Command was the better performer and therefore the more valuable horse.[1]

Sanders turned the two horses over to King T. Leatherbury, an experienced and licensed trainer, for the purpose of training and racing them, and both horses were, indeed, entered in a number of races. In June, 1977, Sanders sent both horses to Leatherbury's farm for a rest; they remained there for three months. In September, 1977, the two horses were shipped, together, to the Steele Farm in Kentucky, apparently for the purpose of selling them. In December, 1977, Sanders received an offer of $100,000 for Dare to Command, which he rejected.

In February, 1978, Sanders directed that Dare to Command be returned to Maryland for further training and racing under Leatherbury's care. Unfortunately, someone in Kentucky sent back Large as Life, rather than Dare to Command. Notwithstanding that a routine comparison of the horse and the foal certificate that accompanied it would have revealed the error, Leatherbury failed to discover the switch. Later that month, Dare to Command, under the name of Large as Life, was sold to a Florida buyer for $25,000. Large as Life, meanwhile, parading as Dare to Command, was at Leatherbury's farm.

On May 27, 1978, Leatherbury, on Sanders' behalf, entered Large as Life, *sub nom* Dare to Command, in the seventh race at Pimlico. The horse was permitted to run, and finished sixth, twenty-three lengths behind the winner. On June 24, 1978, Leatherbury entered the horse, as Dare to Command, in the seventh race at Pimlico; he (the horse) again was permitted to run, and came in seventh, twenty lengths behind the winner. Sanders, laboring under the belief that the horse entered in these races was indeed Dare to Command, was understandably disappointed by these

---

1. Both horses were acquired through claiming races; Sanders claimed Dare to Command for $25,000, Large as Life for $14,500. During the time Sanders owned the horses, Dare to Command was entered in races carrying higher stakes and purses and won considerably more money than Large as Life.

dismal results; he concluded that the horse was not worth what he had initially thought. In September, 1978, still in the belief that the horse was Dare to Command, he sold it for $35,000. Some time in 1979, the error was discovered. The respective buyers exchanged the horses, so that each ended up with the right horse, and Sanders looked around for someone to sue. For some reason, he neglected the obvious targets—Leatherbury and whoever put the wrong horse in the van in Kentucky—and sued instead James Joseph Rowan and the owner of Pimlico Race Course, The Maryland Jockey Club, Inc. (hereafter Pimlico).

Rowan was employed by Pimlico as an "identifier." Under regulations promulgated by the Maryland Racing Commission, a horse may not be permitted to start a race unless it has been "fully identified." COMAR 09.10.01.17K. This identification is made by the "identifier," an employee of the track. Before a race, the trainers or their assistants bring the horses entered in the race to the paddock area to be examined by the identifier and saddled. The identifier, armed with the foal certificates for those horses, checks each horse. He does what Leatherbury could have done in February; he compares the markings on the horse and a tattoo on the horse's lip against the markings and tattoo listed on the foal certificate.[2] If the markings or tattoo do not match those shown on the foal certificate, the identifier immediately notifies the racing stewards and the horse is scratched.

The theory of Sanders' action was that Rowan, the identifier on May 27 and June 24, 1978, was negligent in failing to note that the horse entered by Leatherbury on those days was not, in fact, Dare to Command and thus in allowing Large as Life, a poorer racehorse, to run under the name of Dare to Command. Rowan should have reasonably foreseen, averred Sanders, that the proximate result of his negligence would be a loss in Dare to Command's value as a

---

**2.** COMAR 09.10.01.20C requires each horse to be tattooed on the lip by the Thoroughbred Racing Protective Bureau.

racing and breeding prospect.  Pimlico, of course, was sued on the doctrine of *respondeat superior;* as Rowan's employer, it was liable for his negligence.

Rowan and Pimlico answered Sanders' declaration and filed third-party claims against Leatherbury.  Their basic position was that Leatherbury was the real culprit in the matter in that (1) on both occasions, he brought the wrong horse to the paddock, and (2) even after the two races—during the period from June 24 to the time the horse was sold in September—he should have discovered the switch.  Had Leatherbury exercised due care in either situation, they claimed, the misimpression under which Sanders was laboring would either have been avoided or corrected, and the loss would not have occurred.  As Leatherbury was Sanders' agent, they urged, his negligence is imputable to Sanders, thereby making Sanders guilty of contributory negligence in the matter.  In any event, even if Leatherbury's negligence were not imputable to Sanders, Leatherbury, as the primary negligent actor, would be liable to them for indemnification.

All of this was submitted to a jury in the Circuit Court for Baltimore City, on issues.  The jury answered the issues thusly:

"1. Was James J. Rowan negligent on 5/27/78 and 6/24/78 in identifying 'Large as Life' as 'Dare to Command'?

       _✓_ Yes   _____ No

  (a) If your answer is 'Yes', was that negligence a cause of the reduction in value of 'Dare to Command' complained of by the plaintiff, Harland W. Sanders?

       _✓_ Yes   _____ No

2. Was King T. Leatherbury negligent in failing to discover the entry of 'Large as Life' instead of 'Dare to Command' in the Pimlico races on 5/27/78 and 6/24/78?

       _✓_ Yes   _____ No

  (a) If your answer is 'Yes', was that negligence a cause of the reduction in value of 'Dare to Command' complained of by the plaintiff, Harland W. Sanders?

       _✓_ Yes   _____ No

  (b) If your answer to both Issues 2 and 2(a) is 'Yes', was Mr. Leatherbury then acting as an agent for Mr. Sanders subject to the control and direction of Mr. Sanders?

       _✓_ Yes   _____ No

3. Was Mr. Sanders negligent in allowing 'Large as Life' to be entered in the Pimlico races of 5/27/78 and 6/24/78 under the name of 'Dare to Command'?

_____ Yes      __✓__ No

   (a) If your answer is 'Yes', was that negligence a cause of the reduction in value of 'Dare to Command' complained of by Mr. Sanders?

_____ Yes      _____ No

4. Was Mr. Sanders or any agent of his acting under his direction and control negligent in failing to discover the mistaken entry of 'Large as Life' instead of 'Dare to Command' in the Pimlico races of 5/27/78 and 6/24/78 before 'Dare to Command' was sold in September of 1978?

__✓__ Yes      _____ No

   (a) If your answer is 'Yes', was that negligence a cause of the reduction in value of 'Dare to Command' complained of by Mr. Sanders?

__✓__ Yes      _____ No"

Upon these verdicts, judgment for the defendants Rowan and Pimlico was entered. Sanders appeals, complaining that:

(1) The court erred by not ruling as a matter of law that Leatherbury was an independent contractor and non-servant and that Sanders is not, therefore, vicariously liable for his negligence;

(2) The court erred in its instruction concerning Sanders' vicarious liability;  and

(3) The court erred in submitting to the jury the issue of whether Sanders or his agent was negligent between June 24, 1978 (the second entry at Pimlico) and the time he sold what he thought was Dare to Command.

We find no error, and shall therefore affirm.

### *Leatherbury's Status*

In the present posture of the case, the issues of whether Leatherbury was negligent in bringing the wrong horse to the paddock and whether that negligence was a cause of the reduction in Dare to Command's value are not before us. Those issues were decided by the jury (see Issues 2 and 2(a) above) and no complaint about them is made here. Sanders seeks, rather, to escape the effect of the jury's findings on

those issues by contending that Leatherbury was neither his employee nor his agent, but was instead an independent contractor. Issue 2(b), he argues, should not have been submitted to the jury; as a matter of law the court should have answered it in the negative.

■ Appellees' initial response to this is that Sanders failed to object to the submission of that issue to the jury and has therefore waived his right to appellate review of it.

The record shows that Sanders did not move for a directed verdict on the question of Leatherbury's status as an employee or independent contractor, although he could have done so. He clearly made no objection to the court's submission of Issues 1, 1(a), 2, and 2(a) to the jury. He began to address the question of Leatherbury's agency in the context of Issues 2(b), 3(a), and 4(a) when the court interrupted and declared that Leatherbury's status *vis a vis* Sanders was an issue of fact for the jury to determine. Sanders responded that he was "not going to belabor it" but urged that, by virtue of COMAR 09.10.01.57P, making the trainer the "absolute insurer of the horse he has entered," any agency relationship had been abrogated. We think that is enough to preserve the issue. *See Sergeant Co. v. Pickett,* 283 Md. 284, 388 A.2d 543 (1978).

Our conclusion that the issue is preserved will avail Sanders naught, however, for we find the complaint to be without merit.

The legal theories and distinctions sought to be applied by Sanders arise primarily from actions by third parties who have suffered some physical injury by reason of the tortious physical conduct of a person claimed to be the employee or agent of someone else. Redress is sought against the alleged employer/principal on the basis of vicarious liability—*respondeat superior*—and the defense is interposed that the tortious actor was not that defendant's employee or agent but was instead an independent contractor. It is in that setting that the courts have generally identified these types of relationships—master/servant (or employ-

er/employee), principal/agent, and independent contractor—and drawn distinctions between and among them with respect to the asserted vicarious liability.

■ What emerges from these cases is that the principal/agent relationship is a generic one—a genus, of which the master/servant relationship is a species. Thus, while all masters are principals and all servants are agents, there are some principals who are not masters and some agents who are not servants. Agents who are not servants are regarded as independent contractors. *See Restatement of Agency 2d,* §§ 1, 2, 220; Comments d and e to § 1; Comment a to § 2; and Introductory Note to Title B of Chapter 7, preceding § 219; but *compare* 1 *Mechem On Agency,* 2d ed., §§ 36–40.

The distinctions between servants and other (non-servant) agents have been stated in various ways. In *Henkelmann v. Insurance Co.,* 180 Md. 591, 600, 26 A.2d 418 (1942), the Court, speaking through Judge Delaplaine, stated that

"[t]he distinction between an agent [who is not a servant] and a servant is that an agent [who is not a servant] is employed to represent his principal in reference to some contractual obligation with a third person, whereas a servant is employed to render service to, rather than for, the master."

In *Globe Indemnity Co. v. Victill Corp.,* 208 Md. 573, 581, 119 A.2d 423 (1956), again through Judge Delaplaine, the Court restated the distinction thusly:

"An agent is a person who represents another in contractual negotiations or transactions akin thereto. A servant is a person who is employed to perform personal services for another in his affairs, and who, in respect to his physical movements in the performance of the service, is subject to the other's control or right of control. Persons who render service but retain control over the manner of doing it are not servants."

*Compare Restatement 2d,* Introductory Note to Chapter 7, Title B, which is generally consistent with the approach taken in *Globe Indemnity Co.*

■ It is clear, from subsequent cases, that although there are several criteria for determining whether an agent is, or is not, a servant, the ultimate test is that of control. If the principal "controls or has the right to control the physical conduct of the other in the performance of the service," the relationship is that of master/servant. *Restatement 2d,* § 2(1); *B.P. Oil Corp. v. Mabe,* 279 Md. 632, 370 A.2d 554 (1977); *L.M.T. Steel Products v. Peirson,* 47 Md.App. 633, 425 A.2d 242 (1981). If there is not that degree of control or right of control, the agent is not a servant, but an independent contractor.

■ These distinctions, however stated, have little meaning in themselves; they are important only in defining the duties flowing between the principal and the agent and the principal's liability to third parties harmed by the tortious physical act of the agent. In the latter regard, the prevailing rule is that, where the relationship is that of master/servant, the master is answerable for the tort of the servant committed while acting in the scope of his employment; where the agent is not a servant, the principal is not liable for the agent's negligent conduct "unless the act was done in the manner authorized or directed by the principal, or the result was one authorized or intended by the principal." *Henkelmann v. Insurance Co., supra,* 180 Md. 591, 601, 26 A.2d 418; *Globe Indemnity Co. v. Victill Corp., supra,* 208 Md. 573, 119 A.2d 423; *Cox v. Prince George's County,* 296 Md. 162, 460 A.2d 1038 (1983).

Those are the principles sought to be applied here by Sanders. Leatherbury, he argues, clearly was not his servant, either generally or as to the matter in question. Leatherbury was in business for himself. He trained horses for several owners and was himself an owner. Sanders did not have or exercise the right to control the precise manner in which Leatherbury carried out his duties. Moreover, Sand-

ers urges, Leatherbury did not act in a manner authorized or directed by him, and he did not authorize or intend the result that occurred. Accordingly, he is not answerable for Leatherbury's negligence.

■ What Sanders overlooks is that the liability of a principal for the wrongful acts of his agent is not governed solely by the concepts emanating from these physical injury cases. There is a range of tortious conduct on the part of an agent that may bind the principal and subject him to liability even where the agent is *not* a servant, where the act was *not* done in the manner authorized or directed by the principal, and where the result was *not* authorized or intended by the principal. The principles expressed in *Henkelmann*, *Globe Indemnity Co.*, and *Cox*, in other words, do not represent the whole law in this area, but only part of it.

We can see this, almost at a glance, by examining briefly Chapter 7 of the *Restatement of Agency 2d*, in particular Titles B, C, and D thereof. Title B deals specifically with the master/servant relationship; it defines a "servant" (§§ 220–227) and the concept of "scope of employment" (§§ 228–237), and it sets forth the kinds of tortious acts on the part of a servant for which a master may be held liable (§§ 219, 243–249). Title C is somewhat broader in scope. It describes the situations in which a principal's liability for the torts of his agent is *not* dependent upon the agent being a servant. That is the area we need to explore.

Section 250 introduces Title C with the general statement: "A principal is not liable for *physical harm* caused by the negligent *physical conduct* of a non-servant agent during the performance of the principal's business, if he neither intended nor authorized the result nor the manner of performance, unless he was under a duty to have the act performed with due care." (Emphasis added.)

Succeeding sections then state that a principal *is* liable for a range of tortious conduct that is not of a physical nature and which produces no physical harm. Of particular

interest, in the context of this case, are §§ 258 and 261. Section 258, captioned "Incidental Misrepresentations," provides:

"In the absence of an exculpatory agreement, a principal authorizing a servant *or other agent* to enter into negotiations to which representations concerning the subject matter thereof are usually incident is subject to liability for loss caused to the other party to the transaction by tortious misrepresentations of the agent upon matters which the principal might reasonably expect would be the subject of representations, provided the other party has no notice that the representations are unauthorized." (Emphasis added.)

Section 261, in somewhat similar vein, states:

"A principal who puts a servant *or other agent* in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." (Emphasis added.)

These concepts are carried over into Title D of chapter 7, which deals with a principal's liability for the tortious conduct of an agent within his *apparent* authority. Section 265(1) provides generally that a "master *or other principal* is subject to liability for torts which result from reliance upon, or belief in, statements or other conduct within an agent's apparent authority." [3] Section 267 states:

"One who represents that another is his servant *or other agent* and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant *or other agent* as if he were such." (Emphasis added.)

---

**3.** Section 265(2) makes clear that the apparent authority alone will not suffice to create liability on the part of the principal; there must also be reliance by the third party.

These various principles have found expression in the Maryland cases as well. In the early case of *Tome v. Parkersburg R.R. Co.*, 39 Md. 36, 70–71 (1873), the Court adopted the broad rule enunciated in *Story On Agency*, § 452, that a principal

" 'is liable to third persons in a civil suit, for the frauds, deceits, concealments, misrepresentations, torts, negligences, and other malfeasances, or misfeasances, and omissions of duty, of his agent in the course of his employment, although the principal did not authorize, or justify, or participate in, or indeed know of such misconduct, or even if he forbade the acts or disapproved of them. In all such cases the rule applies *respondeat superior;* and it is founded upon public policy and convenience; for in no other way could there be any safety to third persons in their dealings, either directly with the principal, or indirectly with him, through the instrumentality of agents. In every such case the principal holds out his agent as competent and fit to be trusted, and thereby in effect, he warrants his fidelity and good conduct in all matters within the scope of the agency.' "

As the *Henkelmann* Court noted, some of the early expressions of *respondeat superior* have been narrowed over the years, and the courts "have confined it within limits as narrow as are consistent with the true interests of society." 180 Md. at 598, 26 A.2d 418. Thus, the broad statement in *Tome* of vicarious liability for "torts, negligences, and other malfeasances, or misfeasances" has to be read in the light of later expressions, but the specific liability for fraud, deceit, and misrepresentation has remained more or less intact over the years. *See, for example, Purdum v. Edwards*, 155 Md. 178, 141 A. 550 (1928); *State v. Katcef*, 159 Md. 271, 150 A. 801 (1930); *cf. Balto. Amer. Ins. Co. v. Ulman*, 165 Md. 630, 170 A. 202 (1934). In *B.P. Oil Corp. v. Mabe*, 279 Md. 632, 643, 370 A.2d 554, the Court appeared expressly to adopt § 267 of the *Restatement 2d* (see *ante* ), although in that case it concluded that the requisite element of reliance had not been shown. *See*

*also Atlantic Fruit Co. v. Railroad Co.,* 149 Md. 1, 130 A. 63 (1925); *Restatement of Torts 2d,* §§ 409–429 (Liability Of An Employer Of An Independent Contractor); *Rowley v. Mayor and City Council of Baltimore,* 60 Md.App. 680, 484 A.2d 306 (1984).

It is clear from all of this that Sanders' view of the scope of his liability for Leatherbury's conduct is much too narrow. It is not dependent on whether Leatherbury was his servant. The distinctions and limitations set forth in the *Henkelmann* line of cases have to be considered in context. Those cases all involved some physical act by the agent that caused physical harm to the plaintiff. Most of them involved automobile accidents, and, indeed, the *Henkelmann* Court made special mention that problems arising from the "extensive use of the motor vehicle with its accompanying dangers" had led courts to relax the strict application of *respondeat superior* in those kinds of cases. 180 Md. at 599, 26 A.2d 418. *Globe Indemnity* involved a vicious assault by the alleged agent committed in the course of the agent's employment. Those cases thus fall within the ambit of § 250 of the *Restatement,* and really do not extend beyond it. To conclude otherwise would not only cast Maryland adrift from generally held principles of law, but would also create some serious internal contradictions in the Maryland case law.

We are not concerned here, of course, with any primary liability on Sanders' part to a third party, or with the effect on him of any physical or intentional tort committed by Leatherbury. Our focus is more narrow; the question is one of imputed contributory negligence. What the foregoing discussion establishes, however, is that, in judging that question, we must look beyond the expressions in *Henkelmann,* and thus beyond the issue of whether Leatherbury was or was not Sanders' servant. Section 317 of the *Restatement 2d* makes this clear. It states: "The contributory negligence of an agent acting within the scope of his power to bind his principal by his conduct bars the principal

from recovery against a third person to the same extent as if the principal had been negligent."

Comment a to § 317 states, in relevant part:

"The situations in which the rule stated in this Section is usually important are those in which a master or his belongings are injured by the combined negligence of a third person and his servant. The rule is seldom applicable except in the case of servants, since one not a master is not responsible generally for the negligent *physical* conduct of another. *The rule may apply, however, where an agent not a servant is acting in the performance of his duties to the principal and the principal's interests suffer owing to the negligent misrepresentation of the third person combined with the negligence of the agent in failing to realize their untruthfulness.* Compare the Restatement of Torts, § 552." (Emphasis added.) [4]

The Court of Appeals may well have anticipated § 317 in *Atlantic Fruit Co. v. Railroad Co., supra,* 149 Md. 1, 130 A. 63. The plaintiff there—Atlantic—delivered a load of bananas to the railroad for shipment from New York to Baltimore. The trip was scheduled to take no more than sixteen hours; in fact, it took an additional twenty-five hours, and the bananas spoiled in transit. In partial defense to Atlantic's suit, the railroad offered evidence that Atlantic had sent along a "messenger" with the shipment whose duty it was to regulate the temperature in the railroad cars, that this "messenger" did not perform that

---

**4.** Section 552(1) of the *Restatement of Torts 2d* articulates the tort of negligent misrepresentation. It provides:

"One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

*See also Prosser and Keeton on Torts,* 5th ed., pp. 745–48, and *compare* § 258 of the *Restatement of Agency 2d, supra.*

duty properly, and that had he done so the bananas would not have spoiled, notwithstanding the delay. The precise status of this "messenger"—whether he was a servant or non-servant—is not at all clear and indeed was not mentioned by the Court.

The Court of Appeals approved the trial court's instruction to the jury that if the loss was occasioned by the negligence of the messenger in not regulating the temperature the plaintiff could not recover. It concluded, at 8, 130 A. 63, that

> "while the shipper was under no obligation to send a messenger, and the carrier would have been responsible for the proper care of the goods in transit if no messenger accompanied them, we think the better rule holds that, when the shipper places some one in charge of goods, *he is responsible for any loss caused by his agent's neglect of duty,* at least in the absence of a showing that the carrier knew of such neglect." (Emphasis added.)

The *Atlantic Fruit Co.* case is significant. By 1925—the year it was decided—the distinctions between servants and other agents were well recognized, and yet the rule of imputed contributory negligence was applied without regard to them.

The case before us is a peculiar one, in both its factual and procedural posture. It does not seem to fit precisely into any of the legal pigeonholes discussed above, but it seems clear to us that the concepts enunciated in *Tome v. Parkersburg R.R. Co., Atlantic Fruit Co., State v. Katcef,* and *Restatement of Agency 2d,* §§ 258, 261, 265, 267, and 317 are more relevant than the distinctions arising from what are essentially direct personal injury cases. It is important in this regard to keep in mind the underlying rationale of *respondeat superior.* As the Court pointed out in *Adams v. Cost,* 62 Md. 264, 267 (1884), the doctrine arose from the maxim, *qui facit per alium facit per se* (he

who acts through another acts himself); hence, the theory that, when an agent commits a tortious act within the scope of his designated duties, the principal "is constructively present; the negligence is his negligence, and he is responsible for the resulting injury."

Regulations of the Maryland Racing Commission specify that a horse may be entered in a race only "by the owner of the horse, by his authorized agent, or by some person deputized by him" (COMAR 09.10.01.17C), that a horse "that has not been fully identified may not be permitted to start" (COMAR 09.10.01.17K), that a horse may not be permitted to start unless its name is registered with the racing secretary (COMAR 09.10.01.17L), and that the trainer "is the absolute insurer of the horse he has entered" (COMAR 09.10.01.57P). Other regulations provide that the trainer "may represent the owner in the matter of entries [and] declarations..." (COMAR 09.10.01.57F), that the trainer "shall have his horse in the paddock at the time appointed" (COMAR 09.10.01.57G), and that the trainer "shall attend his horse in the paddock..." (COMAR 09.10.-01.57H).

As much as the Maryland Rules of Practice and Procedure are not merely guides to the practice of law but "precise rubrics" to be read and followed, *Countess v. State*, 286 Md. 444, 463, 408 A.2d 1302 (1979), so these regulations of the Racing Commission are more than merely helpful hints to those engaged in the horse racing industry. They are also precise rubrics, intended to ensure the integrity of the industry and to protect the public against fraud and corruption. They do this, in part, by establishing certain specific procedures to be followed in the running of races, by requiring nearly everyone participating in the conduct of racing to be licensed, and by placing specific responsibility on the various licensees to follow the mandated procedures.

In the context of the issue now before us, two things are absolutely clear from this regulatory scheme: (1) the trainer is responsible for seeing to it that the right horse is brought to the paddock, and (2) in all that the trainer does in entering the horse and causing the horse actually to run in a race, he acts as the owner's designated agent. Throughout, in his dealings with the track, he represents the owner, whose horse it is and who primarily benefits from the horse's success. It is not so much a matter of servant vs. independent contractor; by virtue of the regulatory scheme and the contract between them, the owner has placed the trainer in the position of being able to switch or otherwise misrepresent the horse he has entered for the owner and thus, wittingly or unwittingly, to defraud the track and the public. As a licensed and experienced owner, Sanders understood that Leatherbury would be acting directly and exclusively on his behalf in these important matters, and he cannot be heard to disavow the mistakes that Leatherbury made in discharging his agency. It necessarily is a case of *qui facit per alium facit per se;* Leatherbury's negligence is Sanders' negligence and Sanders is responsible for the resulting injury. *Adams v. Cost, supra,* 62 Md. at 267.

For these reasons, the court clearly did not err in declining Sanders' tenuous invitation to exonerate him as a matter of law.

*Jury Instruction*

Sanders' second argument stems from the same misconception as his first—that vicarious culpability depends upon a showing that he had a right to control the operative details of Leatherbury's work. He complains that the court's instruction in this regard was too general and allowed the jury to find agency "merely because [Leatherbury] was acting on behalf of Sanders and Sanders directed where the horse should race."

■ There are three answers to this complaint. First, unlike the first issue, there is not even a semblance in the record of a timely, articulated objection to the instruction. Second, the instruction given, read fairly, does not suffer from the deficiency complained of; and, third, in light of the conclusions expressed in regard to the first issue, it would appear that Sanders in fact got more than was his due.

### *Leatherbury's Agency After June 24*

The defense of contributory negligence was in two parts. The first concerned Leatherbury's negligence in entering the wrong horse in the two races; the second had to do with his failure to discover the error during the period after the second race and before the horse thought to be Dare to Command was sold. Had Leatherbury (or Sanders) been diligent, the defendants argued, the mistake would have been discovered before Large as Life, *sub nom* Dare to Command, was sold in September. In that event, the two horses would again have been switched and Sanders would have suffered no loss.

This second aspect of the contributory negligence defense was submitted to the jury as Issues 4 and 4(a). By answering them in the affirmative, the jury found that Sanders "or [an] agent of his acting under his direction and control" was indeed negligent in failing to discover the mistake during this period, and that such negligence also was a cause of the loss in value of Dare to Command. Sanders' final complaint is that the court should not have submitted those issues to the jury.

■ We need not address that question. In light of the jury's response to Issues 2, 2(a), and 2(b) and our conclusion that there was no error in the submission of those issues, the complaint about Issues 4 and 4(a) is moot.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.