**Harald SCHWEIZER, Plaintiff,**

v.

**Michael P. KEATING,
et al., Defendants.**

**CIV. A. No. MJG–99–2406.**

United States District Court,
D. Maryland,
Northern Division.

Feb. 27, 2001.

---

John H. West, III, Thomas C. Costello, West & Moore, LLC, Baltimore, MD, for Plaintiff.

William J. Murphy, Robert T. Shaffer, III, Murphy & Shaffer, Baltimore, MD, for Ridgewood Electric Power Trust III and Ridgewood Power Corp.

Alan L. Brigges, Timothy W. Bergin, William O'Neill, Washington, DC, for International Aerotech, Inc. and Aerotech International Leasing Co., LLC.

Michael P. Keating, Woodstock, MD, pro se. Patrick Attridge, King & Attridge, Rockville, MD, for Euclid Systems Corporation.

Alvin I. Frederick, James E. Dickerman, Eccleston and Wolf, P.C., Baltimore, MD, Michael E. Scott, Nutter, McClennen & Fish, Boston, MA, for Delta Equity Services Corp.

GARBIS, District Judge.

The Court has before it the Ridgewood Defendants' Motion for Summary Judgment and the materials submitted by the

parties relating thereto. The Court has held a hearing on this motion and had the benefit of the arguments of counsel.

## I. BACKGROUND

### A. Ridgewood Trust III

Defendant Ridgewood Power Corporation, a Delaware corporation, is the managing shareholder of six business trusts, including Defendant Ridgewood Electric Power Trust III. The business trusts participate in the development, construction, and ownership of independent power projects throughout the United States.

Defendant Ridgewood Electric Power Trust III (hereinafter "the Trust") was formed as a Delaware Business Trust in December of 1993.[1] The Trust sought to raise capital through a private placement and invest those funds in independent power projects that had been developed as a result of the Public Utility Regulatory Policies Act of 1978 (hereinafter "PURPA").[2]

### B. Confidential Offering Memorandum

Shares sold through the private placement (hereinafter "the Offering") were exempt from the registration requirements of the Securities Act of 1933 and state blue-sky laws, pursuant to the provisions of § 4(2) of the Securities Act of 1933, Securities Exchange Commission Rule 506, and comparable provisions in the state codes. However, all shares were to be sold pursuant to the detailed terms and conditions set forth in the Confidential Offering Memorandum (hereinafter "the Offering Memo").

The Offering Memo, which was over 100 pages in length, stated that the Trust had been "organized to invest in (i) non-utility generating facilities which sell electrical and/or thermal power (typically steam and hot water) to utilities and industrial users and (ii) other non-utility facilities which provide power related products or services." Mem. In Supp. Of The Ridgewood Def. Mot. for Summ. J., Ex. A at 1.

The Offering Memo contained detailed information about the investment and numerous warnings, including the following statement which appeared on the first page:

> This investment is speculative and nonliquid and involves a high degree of risk, including severe restrictions on transferability of the Shares. See Risk Considerations. Purchases will be accepted only from persons meeting the requirements set forth under Investor Suitability Standards. The operation of the Trust involves transactions among the Trust, the Managing Shareholder, certain of their affiliates and associates, and the Trustees which may involve potential conflicts of interest. See Potential Conflicts of Interest.

See id.

Other cautionary statements included:

> • that investors must rely on their own examination of the person or entity creating the securities and the terms of the offering when making an investment decision;
>
> • that investment in the Trust is suitable only for persons who meet the investor suitability standards set forth in the Offering Memo (e.g. that qualify as "accredited investors" under the applicable

---

**1.** For purposes of this discussion, Ridgewood Power and Ridgewood Electric Power Trust III will be referred to as "the Ridgewood Defendants" collectively.

**2.** PURPA encourages the development of electric generation plants using nontraditional resources or renewable resources, and those offering production efficiencies.

regulations), have substantial net worth, have no need for liquidity from such investment, and are able to bear the loss of the entire investment;

• that an investor will have no assurance that he will be able to liquidate his investment in the Trust and must be prepared to bear the economic risk of the investment until the Trust is terminated or dissolved;

• that no broker, salesman, or any other person has been authorized to give any information or to make any representations in respect to the offering, other than those contained in the Offering Memo and any such representations should not be relied upon; and,

• that sales material may be used in connection with the offering of the shares only when accompanied by or preceded by the delivery of the Offering Memo.

*See generally id.*

## C. *Delta Equity Services Corporation*

### 1. *The Ridgewood/Delta Agreement*

Ridgewood Power entered into agreements with numerous securities broker/dealers (hereinafter referred to as "best efforts agreements"), pursuant to which, the broker/dealers would serve as an independent contractors, selling shares in the Trust on a best efforts basis. In return, the broker/dealers would receive a percentage of their gross sales of Trust shares.

On January 3, 1994, Delta Equity Services Corporation (hereinafter "Delta"), a broker/dealer based in Bolton, Massachu-setts, entered a best efforts agreement with the Ridgewood Defendants. The Ridgewood/Delta agreement, which was prototypical of the best efforts agreements entered into by the Ridgewood Defendants and their broker/dealers, identified a number of terms and conditions governing the manner in which Trust shares were to be offered to prospective investors.

### 2. *The Michael Keating/Delta Relationship*

Michael P. Keating (hereinafter "Keating"), was a registered securities representative employed by Delta.[3] Keating conducted business under the name "The Keating Advisory Group," and operated out of his own offices in Baltimore, Maryland. Keating received incentive-based compensation derived primarily from commission on trades, mark-ups on sales to customers, or mark-downs on purchases of securities from customers or otherwise. Keating did not receive any compensation from the Ridgewood Defendants although he received compensation from Delta which took into account sales for the benefit of the Ridgewood Defendants.

There was only limited direct contact between representatives of the Ridgewood Defendants and Keating. A Ridgewood representative visited Keating on approximately six occasions over the course of two and a half years,[4] and Keating (and his secretary) had several phone conversations with Ridgewood personnel regarding the receipt of investor checks and documents. *See* Pl. Opp. Mem. To The Ridgewood Def.

---

3. There was no contractual relationship between the Ridgewood Defendants and Keating.

4. The Ridgewood representative delivered the Trust prospectus to Keating so that he could consider offering the securities to high net worth clients. On another occasion, the representative delivered some investor kits (containing a prospectus and the Subscription Agreement). The representative also attended an investor meeting arranged by Keating. *See generally* Pl. Opp. Mem. To The Ridgewood Def. Mot. for Summ. J., Ex. K.

Mot. for Summ. J., Ex. J at 13–14. *See generally id.,* Ex. K.

### D. *Harald Schweizer*

#### 1. *Personal Background*

Plaintiff Harald Schweizer (hereinafter "Plaintiff" or "Schweizer") is a 57 year old native of Austria who currently resides in Mooresville, North Carolina. Schweizer learned basic English at 10 or 12 years old, and has used English regularly since 1973.

Schweizer received a degree in business administration from an Austrian trade school in 1960. Subsequently, Schweizer held a series of business positions in Germany, and served a two-year term in the German military.

In 1973, Schweizer began working as an export salesperson with Michael Weinig AG (hereinafter "Weinig"), a German manufacturer of woodworking machinery. Schweizer advanced to the position of vice president, and in 1982, he was transferred to the United States to supervise Weinig's North American operations.

In 1990, Schweizer left this position and became an independent sales representative for Weinig. Schweizer formed the S & M corporation to operate his independent sales business. He later formed Schweizer Management, Inc., a second corporation organized to pay office expenses.[5]

Between 1993 and 1996, Schweizer's personal income exceeded $400,000 annually. *See generally* Mem. In Supp. Of The Ridgewood Def. Mot. for Summ. J., Ex. D. In 1997, Schweizer earned over $550,000. *See id.*

#### 2. *Schweizer's Investments*

##### a. *Schweizer/Keating Relationship*

In late 1993, Schweizer met Keating. Schweizer and Keating had sporadic contact between December of 1993 and June of 1995, at which time Schweizer agreed to use Keating as his financial advisor. Schweizer alleges that Keating informed him that his funds would be invested conservatively, with an eye toward preservation of capital and long term growth.

During the course of their relationship, Keating provided Schweizer with written materials regarding the investments Keating recommended he purchase. Schweizer alleges that Keating advised him that he had no need to read or comprehend these materials. Hence, Schweizer did not rely on the materials in making decisions, but only on Keating's investment advice.

##### b. *Investment in Ridgewood Trust III*

On June 12, 1995, Keating and Schweizer discussed the Trust investment. Keating allegedly stated that the Trust: 1) was a safe investment; 2) that it comported with Schweizer's investment objectives; and 3) that Ridgewood planned to "go public," guaranteeing an increase in the value of the securities. These were, of course, false statements that were in no way authorized by the Ridgewood Defendants.

Schweizer acknowledges that he received a copy of the Offering Memo, but does not remember when he received that document. *See* Mem. In Supp. Of The Ridgewood Def. Mot. for Summ. J., Ex. C at 169–173. In any event, Schweizer maintains that he did not read the Offering Memo, but relied entirely on Keating's recommendation to invest in the Trust. *See id.*

Pursuant to Ridgewood regulations governing the sale of Trust shares, Schweizer was required to complete a "Subscription Agreement" to be submitted to Ridgewood along with the purchase price for Trust

---

**5.** This corporation was formed pursuant to the advice of Schweizer's accountants.

shares. The Subscription Agreement contained a number of disclosures about Ridgewood and the Trust shares that would be purchased pursuant to the agreement. The Subscription Agreement also included several acknowledgments, including the following:

- that Schweizer received and read a copy of the Offering Memo;
- that Schweizer had been advised that an investment in the shares would involve a high degree of risk;
- that Schweizer was an "accredited investor;"[6] and,
- that Schweizer had completed an Individual Investor Questionnaire.

*See generally* Mem. In Supp. Of The Ridgewood Def. Mot. for Summ. J., Ex. E. The Subscription Agreement was signed by Schweizer on behalf of his IRA (the entity that tendered the $25,000 check) on May 15, 1995. *See id.* at 6.

The Individual Investor Questionnaire (hereinafter "the Questionnaire") was attached to the Subscription Agreement, and contained financial questions that would enable the Ridgewood Defendants to determine whether prospective investors met the investor suitability requirements set forth in the Offering Memo. Schweizer's Questionnaire indicated that he had a net worth over $1 million, with an anticipated gross income for 1994 in excess of $200,000. *See id.* at 7–10. The Questionnaire also indicated that Schweizer was a frequent investor in the public securities markets. *See id.* at 9.

The Questionnaire was signed by Schweizer. The signature page contained a number of declarations, including the following:

- that the information provided was complete and correct and could be relied upon by the Trust in determining whether Schweizer met the suitability requirements set forth in the Offering Memo;
- that Schweizer had no need for liquidity of the Shares;
- that Schweizer was able to bear the economic risk of an investment in the Trust of the size contemplated; and,
- that Schweizer could afford a complete loss of his investment.

*See id.* at 10.

Schweizer acknowledges that he signed or initialed the Subscription Agreement and the Investor Questionnaire, but alleges that he did not read the three pages he signed, and that he did not see any pages other than those that he signed.

The fully completed Subscription Agreement and Individual Investor Questionnaire were sent to the Ridgewood Defendants. The Ridgewood Defendants returned a copy of the executed acceptance page directly to Schweizer on September 5, 1995.

Schweizer alleges that he first became aware that the Trust securities were spec-

---

**6.** Schweizer was also required to initial a line indicating that he was an accredited investor. Schweizer initialed the line indicating that he was an accredited investor pursuant to Regulation D Section 501(a)(1) (applying to certain banks), 501(a)(2)(applying to certain business development companies), 501(a)(3)(applying to charitable organizations), or 501(a)(7)(applying to trusts). *See* Mem. In Supp. Of The Ridgewood Def. Mot. for Summ. J., Ex. E at 5. He should have initialed the line directly above the one that he actually initialed, indi-

cating that he was an accredited investor because the IRA (the purchaser of the Trust shares) was owned by a person (Schweizer) meeting certain net worth requirements.

Despite this error, Ridgewood accepted the Subscription Agreement because the information provided on Schweizer's Investor Questionnaire (e.g. the net worth information) was sufficient to qualify Schweizer as an "accredited investor." *See* Mem. In Supp. Of The Ridgewood Def. Mot. for Summ. J., Ex. I at 21–25.

ulative and illiquid in October 1998 when he retained counsel to advise him of his legal rights regarding the purchase of two unrelated securities known as the "QuickStart Bridgeloan" and "CBT Notes,"[7] both of which were obtained through Keating.

Due to the nature of Schweizer's investment, ownership of shares in a beneficial trust, he has been unable to liquidate his investment. However, Schweizer has received a return on his investment. To date,[8] Schweizer has been paid $8732.22 in distributions. This represents a cumulative rate of return on the investment of 34.93%, or approximately 7% per year.[9]

### E. Procedural History

On May 10, 1999, Schweizer filed suit in the Circuit Court for Baltimore County against: 1) Michael Keating, 2)Delta Equity Services Corporation, 3) Euclid Systems Corporation; 4) International Aerotech, Inc.; 5) Aerotech International Leasing Company, LLC; 6) IMX Pharmaceutical, Inc.; 7) QuickStart Technologies, Inc.; 8) Ridgewood Power, LLC; and, 9) Ridgewood Electric Power Trust III.

7. Schweizer alleges that these securities were "bogus" and caused him to lose $200,000. There is no contention that there is anything "bogus" about the investment here at issue.

8. At the time the instant motion was filed, the most recent payout had occurred in June of 2000.

9. In 1997, Keating and Andrew Bodnar (hereinafter "Bodnar"), also a Delta representative, allegedly began a course of fraudulent conduct involving the sale of fictitious promissory notes to investors. In August 1997, the Ridgewood Defendants discovered facts leading it to believe that Bodnar may have defrauded an investor by accepting funds to purchase Ridgewood securities. The Ridgewood Defendants immediately advised Delta, the National Association of Securities Dealers, and the Massachusetts and Ohio securities administrators. However, none of these entities took any action against Bodnar.

On or about August 6, 1999 QuickStart Technologies, Inc., removed the case to federal court on the basis of diversity jurisdiction. At present, only Schweizer's claims against Keating, Euclid Systems Corporation, and the Ridgewood Defendants remain pending before this Court.[10]

Schweizer's Amended Complaint is predicated upon the contention that he was unwittingly sold risky, illiquid, or worthless investments. The Amended Complaint contains five counts applicable to the Ridgewood Defendants. These are:

Count I- The Ridgewood Defendants committed "actual fraud" by misrepresenting and omitting material facts about the securities sold to Schweizer;

Count II-The Ridgewood Defendants negligently misrepresented the same material facts;

Count III-The Ridgewood Defendants, violated the Maryland Securities Act, by engaging in a scheme, device, or artifice to defraud Schweizer;

Count IV-The Ridgewood Defendants were negligent in their supervision of Keating; and,

In February 1998, The Maryland Division of Securities revoked Keating's and Bodnar's licenses to sell securities in Maryland. The Ridgewood Defendants had no knowledge of any connection between Keating and Bodnar relating to the events which caused the revocation of their licenses.

10. International Aerotech, Inc. and Aerotech International Leasing Co., LLC have filed for bankruptcy protection. Accordingly, claims against those entities have been stayed. Claims against Delta have been stayed as a result of a federal interpleader action in Ohio. See Am. Int'l Specialty Lines Insur. Co. v. Delta Equity Servs. Corp., Case No. 5:99 CV 1254 (N.D.Ohio 1999). Schweizer has entered into settlement agreements with IMX Pharmaceutical, Inc., and QuickStart Technologies, Inc.

Count V-The Ridgewood Defendants negligently failed to ensure that Schweizer was an accredited investor and that he understood the significance and/or consequence of purchasing unregistered securities.

The parties are before this Court on the Ridgewood Defendants' Motion for Summary Judgement on all claims against them.

## II. LEGAL STANDARD

In deciding a summary judgment motion, the Court must look beyond the pleadings and determine whether there is a genuine need for trial. *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether that evidence is so one-sided that one party must prevail as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–53, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the Defendants carry their burden by showing an absence of evidence to support a claim, the Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

An issue of fact must be both genuine and material in order to forestall summary judgment. An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the Plaintiff. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. An issue of fact is material only if the establishment of that fact might affect the outcome of the lawsuit under governing substantive law. *See id.* A complete failure of proof concerning an essential element of the Plaintiff's case necessarily renders all other facts immaterial. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. Moreover, the production of a mere scintilla of evidence in support of an essential element will not forestall summary judgment. *See Anderson*, 477 U.S. at 251, 106 S.Ct. 2505.

## III. DISCUSSION

### A. Counts I, II, and III

#### 1. Direct Liability

■ Plaintiff argues that the Ridgewood Defendants may be held directly liable for the violations charged in Counts I, II, and III of the Amended Complaint because *they themselves* failed to inform Plaintiff that the shares were speculative and illiquid. *See* Pl. Opp. Mem. To The Ridgewood Def. Mot. for Summ. J. at 21–22. The Ridgewood Defendants counter that Plaintiff has not presented any evidence that would support a finding of direct liability.

Plaintiff's argument is completely unsupported by the record in this case. It is undeniable that the Ridgewood Defendants undertook extensive measures designed to ensure that prospective investors would be aware that the Trust shares were both speculative and illiquid. These measures included:

- preparing an Offering Memo that contained numerous warnings as to the nature of the shares to be purchased;

- requiring independent broker/dealers to disseminate the Offering Memo prior to the sale of the securities;

- reiterating many of the warnings set forth in the Offering Memo in the Subscription Agreement and Investor Questionnaire;

- requiring investors to sign the Subscription Agreement which contained acknowledgments that the buyer received

and read the Offering Memo, and had been advised that the investment was speculative and illiquid; and,

● requiring investors to complete and sign the Investor Questionnaire which contained acknowledgments that the investor had no need for the liquidity of the shares and was able to afford a complete loss of the investment.

*See generally* Mem. In Supp. Of The Ridgewood Def. Mot. for Summ. J., Ex. A, Ex. B, Ex. E. In light of these precautionary measures, Plaintiff's assertion that Ridgewood Defendants failed to advise him that the shares were speculative and illiquid is without basis.

## 2. *Vicarious Liability*

In the alternative, Plaintiff alleges that the Ridgewood Defendants should be held vicariously liable for Keating's misstatements and omissions. Plaintiff's vicarious liability claim is wholly dependent upon the existence of an agency relationship between the Ridgewood Defendants and Keating. Plaintiff alleges that a genuine issue of material fact exists as to whether the Ridgewood Defendants and Delta, Keating's employer, shared an agency relationship, and thus, whether the Ridgewood Defendants are vicariously liable for Keating's actions as a Delta employee. Plaintiff seeks to impose vicarious liability on a respondeat superior argument and an actual agency by inference theory. The Ridgewood Defendants counter that they cannot be held liable for the actions of Delta's employee, Keating because Plaintiff cannot establish the existence of an agency relationship between the Ridgewood Defendants and Keating under either theory articulated.

### a. *Respondeat Superior*

■ Under the doctrine of respondeat superior, an employer is vicariously liable for the tortious conduct of his employee when that employee is acting within the scope of the master-servant relationship. *See Hunt v. Mercy Med. Ctr.*, 121 Md.App. 516, 545, 710 A.2d 362 (1998); *Kersten v. Van Grack, Axelson & Williamowsky, P.C.*, 92 Md.App. 466, 469, 608 A.2d 1270 (1992); *Rubin v. Weissman*, 59 Md.App. 392, 404, 475 A.2d 1235 (1984). The rule of respondeat superior does not apply, however, when the wrongdoer is an independent contractor. *See Brady v. Ralph Parsons Co.*, 308 Md. 486, 512, 520 A.2d 717 (1987); *Rowley v. Mayor and City Council of Baltimore*, 305 Md. 456, 461, 505 A.2d 494 (1986).

In the instant case, the best efforts agreement entered into between the Ridgewood Defendants and Delta specified that:

[Delta's] relationship with the Trust and the Managing Shareholder is as an independent contractor and that nothing herein shall be construed as creating a relationship of partners, affiliates, joint venturers, or employer and employee, between [Delta] and the Managing Shareholder or the Trust.

Mem. In Supp. Of The Ridgewood Def. Mot. for Summ. J., Ex. B at 7. Despite this express contractual disavowal of a employee-employer relationship, Plaintiff maintains that such a relationship should be inferred from the words and conduct of the parties.

■ Where the nature of the relationship between a principal and an agent is in dispute, the ultimate test for whether an agent is a servant is control, for a master " 'controls or has the right to control the physical conduct of the [servant] in the performance of the service.' " *See Hunt*, 121 Md.App. at 545, 710 A.2d 362 (quoting *Sanders v. Rowan*, 61 Md.App. 40, 51, 484 A.2d 1023 (1984)). Maryland courts have also considered a number of other factors as indicia of the existence of an employee-

employer relationship, including: 1) the ability to select and engage the agent; 2) the power to dismiss the agent; and, 3) the payment of wages. *See Rubin*, 59 Md. App. at 404, 475 A.2d 1235.

### 1) *Right to Control*

■ Plaintiff argues that the provisions of the best efforts agreement and the Offering Memo establish that the Ridgewood Defendants had the right to control the manner in which Delta and its employees offered Ridgewood securities, evincing an employer-employee relationship. He contends that the following restrictions support this conclusion:

- Delta representatives could only offer shares to persons reasonably believed to meet the financial suitability and other standards set forth in the Offering Memo;
- Delta representatives were required to provide each offeree with a copy of the Offering Memo and the related exhibits during the course of the offering and *prior* to sale;
- Delta representatives could not offer Trust shares by any form of general advertisement or general solicitation;
- Delta representatives were required to inform prospective investors that they had a right to ask questions directly of the Ridgewood Defendants;
- Delta representatives could not use any sales materials not approved by the Ridgewood Defendants; and,
- Sales by Delta representatives were not effective until accepted by the Trust.

*See generally* Mem. In Supp. Of The Ridgewood Def. Mot. for Summ. J., Ex B.

■ The reservation of some control over the manner in which work is done does not destroy the independent contractor relationship where the contractor is not deprived of his judgment in the execution of his duties. *See Taylor v. Local No. 7 Int'l Union of Journeymen Horseshoers*, 353 F.2d 593, 597 (4th Cir.1965). The determination as to whether or not sufficient control has been retained rests upon the peculiar facts of each case. *See id.*

In the present context, the sale of securities by private offering, the contractual provisions at issue are insufficient to establish that the Ridgewood Defendants had the right to control Delta and its representatives. Securities sold by private offering are subject to numerous "prophylactic" regulations designed to ensure that they are sold to informed, sophisticated investors. *See generally* Securities Act of 1933, as amended by Securities Exchange Act of 1934, 15 U.S.C. § 77a *et seq.;* 17 C.F.R. § 230.501 *et seq.* Most of the "control" provisions identified by Plaintiff are identical to those imposed under the applicable securities laws, and enable the offering to retain exemption from registration.

Plaintiff has not presented any evidence suggesting that the restrictions placed upon Delta and its employees were atypical of those imposed upon independent broker/dealers selling privately offered securities. Indeed, responsible issuers would be expected to include such contractual provisions in selling agreements and related documents in order to ensure compliance with the law.

Delta and its representatives retained a significant degree of discretion in selecting potential investors to whom trust shares would be offered and the manner in which the investment would be presented to the prospective buyer; hence, there is no basis for a determination that they were deprived of their discretion. Plaintiff's assertion that the Ridgewood Defendants controlled Delta and its representatives in a manner that is indicative of a master-servant relationship is without merit.

### 2) *Other Factors*

The Ridgewood–Delta relationship is devoid of other indicia of an employer-employee relationship. The Ridgewood Defendants maintained offices that were separate and distinct from those operated by Delta, and did not function in a supervisory or managerial capacity in relation to Delta's representatives.

The Ridgewood Defendants did not have the power to participate in Delta's hiring decisions, nor the right to authorize individual Delta representatives to offer shares to prospective investors. Moreover, the Ridgewood Defendants did not have the ability to discipline or dismiss Delta representatives.

Finally, the Ridgewood Defendants did not exert any control over the amount of compensation received by individual Delta representatives. They did not dictate the rate of commission received by individual Delta representatives, issue the commission checks received by those representatives, or engage in any other behavior that would support a conclusion that they controlled the compensation paid to individual Delta employees.

Accordingly, there is no basis upon which a reasonable jury could find that the relationship between the Ridgewood Defendants and Delta was that of employer and employee.

### b. *Actual Agency By Inference*

Under the doctrine of actual agency by inference, a master-servant relationship may be inferred, in the absence of a written agreement creating such a relationship, if it is shown that: 1) the agent was subject to the principal's right of control; 2) the agent had a duty to act primarily for the benefit of the principal; and

3) the agent held the power to alter the legal relations of the principal. *See Schear v. Motel Mgmt. Corp.,* 61 Md.App. 670, 687, 487 A.2d 1240 (1985) (citations omitted).

Plaintiff is unable to establish the first or third elements necessary to prove actual agency by inference. For reasons discussed at length in the preceding subsection, Plaintiff's contention that the Ridgewood Defendants had the right to control Delta and its representatives in a manner characteristic of a master-servant relationship is baseless. Moreover, Plaintiff has conceded that the Ridgewood Defendants retained the ultimate authority to accept or reject potential investors presented by the Delta representatives; hence there can be no legitimate claim that Delta had the power to alter the Ridgewood Defendants' legal relations. *See* Pl. Opp. Mem. To The Ridgewood Def. Mot. For Summ. J. at 15. Accordingly, there is no basis for inferring actual agency in the instant case.

### c. *Dual Agency*

As discussed above, Plaintiff cannot establish that the Ridgewood Defendants and Delta shared a master-servant relationship, making Keating a Ridgewood agent rather than an independent contractor. Accordingly, it is unnecessary to resolve the "dual agency" issue presented herein. Nevertheless, the Court will note that had Plaintiff been able to establish that Keating was acting as agent for the Ridgewood Defendants, it would find recovery barred by virtue of the "dual agency" doctrine. This doctrine is frequently stated in the terms used by Judge Motz in *Cerniglia v. Pretty,* 674 F.Supp. 1167, 1169 (1987)[11]. Judge Motz stated that it is

---

**11.** The *Cerniglia* case is analogous to the case at bar. In *Cerniglia,* Plaintiffs purchased a

liquor business through an agent who also represented the sellers of the business. 674

well-established that "one principal is not civilly liable to another for the tortious act of an agent who acts for both parties with their consent unless he in some manner participates in the wrong." *Id.* (citations omitted).

■ In the instant case, Plaintiff alleges that Keating was a dual agent, acting as Ridgewood's agent by selling shares in Ridgewood Trust III while serving as his personal investment advisor. *See* Amd. Compl. at § 28 (alleging that "at all times relevant to this Complaint, Keating acted in a fiduciary capacity as an investment advisor to Schweizer and was required to deal with Schweizer in the utmost good faith and trust"). Plaintiff has not alleged that the Ridgewood Defendants were co-participants in Keating's alleged scheme to sell speculative, illiquid securities to unwitting investors, nor is there any evidence to support of such a conclusion.

Plaintiff seeks to argue that he did not know that Keating was acting as agent for the Ridgewood Defendants as well as for himself. This contention raises two issues of academic interest.

First, Plaintiff knew, as he had to, that Keating was working for Delta and selling the Ridgewood securities for which he would be receiving compensation. Hence, to the extent that these facts would make Keating an agent of the Ridgewood Defendants, Plaintiff was aware of them.

Second, as one traces through the case law relating to the "dual agency" doctrine, it appears that there may be an open question as to whether the Plaintiff must have knowledge of the fact that his agent is also acting for another principal. For example, in *Hodges v. Mayes*, the Court,

although stating the mutual knowledge condition, refers to the dual agency principle in terms that do not include this as a prerequisite. 240 Ga. 643, 242 S.E.2d 160, 162 (1978). The *Hodges* court stated that:

The principle is recognized by Mechern in his treatise on Agency wherein he states that, "(W)here two or more principals employ the same agent, whether as a means of dealing with one another or to protect their common interests, one cannot charge the other not actually at fault with the misconduct of the common agent. The latter owes no more duty to one than to the other; each of the principals is under and equal duty to supervise the agent and to protect his own interest, and there is no reason why the misconduct of the agent should be imputed to one principal rather than to the other." Mechern, The Law of Agency, s 2140 (2nd ed.1914); See, 3 C.J.S. Agency s 430 (1973) wherein it is stated that "One is not civilly liable to another for the tortious acts of an agent who acts for both parties unless he in some manner participates in the wrong."

*Id.* at 162.

In some future case in which the Plaintiff's knowledge of dual agency is material, it may well be held that an "innocent" principal/defendant who does nothing to hide or cause the agent to hide a dual relationship, may have the benefit of the dual agency doctrine. This issue is not presented in the case at Bar due to (1) the absence of an agency relationship between the Ridgewood Defendants and Keating; and, (2) the fact that Plaintiff knew that Keating was acting for various sellers of securities and earning compensation based upon the sale made to Plaintiff. In sum,

---

F.Supp. 1167. Plaintiffs brought suit against the sellers, alleging that the agent made false representations about the profitability of the business. *See id.* Plaintiffs conceded that

agent was a dual agent, and the court held that this concession was dispositive of Plaintiffs' claim against the sellers. *See id.*

the question of whether the "dual agency" doctrine bars Plaintiff herein is not material. If it were, this Court would hold for the Defendants on the issue.

## B. *Count IV–Negligent Supervision*

■ In Count IV of the Amended Complaint, Plaintiff alleges that Ridgewood "failed to adequately supervise... Keating, and to detect and remedy his wrongdoing." Amd. Compl. § 46. In particular, Plaintiff argues that the Ridgewood Defendants were negligent in their supervision of Delta representatives in that they:

- failed to contact customers directly to ensure that they understood the significance of purchasing unregistered securities;

- failed to verify information contained in the Investor Booklet with the individual investor himself;

- failed to require Delta's agents to sign or verify that the information contained in the Investor Booklet was accurate;

- failed to contact the individual investor instead of the Delta representative to supply information missing in the Investor Booklet;

- accepted Investor Booklets containing more than one type of handwriting in response to questions; and,

- accepted Plaintiff's booklet although it identified Plaintiff as an accredited investor due to the fact that he was a banking institution as opposed to an accredited investor due to the fact that he had the requisite individual net worth.

*See* Pl. Opp. Mem. to the Ridgewood Def. Mot. for Summ. J. at 29–30. The Ridgewood Defendants contend that they did not have a duty to supervise the type of day-to-day activities identified by the Plaintiff.

■ Under Maryland law, liability for negligent supervision has arisen, almost exclusively, in cases involving master-servant relationships. There are few exceptions to this practice, and these cases typically have involved ultra hazardous activities, situations in which the principal has an *absolute* duty to ensure that the independent contractor's activity is conducted in a safe manner. *See, e.g., Gardenvillage Realty Corp. v. Russo*, 34 Md. App. 25, 37, 366 A.2d 101 (1976) (citations omitted)(discussing duties not delegable to independent contractors).

In the instant case, it is undeniable that the relationship between the Ridgewood Defendants and Delta was that of principal and independent contractor, a fortiori, Keating was no more than an employee of an independent contractor. The effect of imposing liability on the Ridgewood Defendants in this case would be to create a duty to supervise and inspect the day-to-day activities of each registered agent employed by every large securities firm retained by the Ridgewood Defendants as an independent broker/dealer. The imposition of such a duty plainly conflicts with the delegation of control that is characteristic of the independent contractor relationship.

Plaintiff has not adduced any legal authority suggesting that the Ridgewood Defendants had a duty to supervise the individual representatives employed by Delta. However, even if the Ridgewood Defendants had such a duty, Plaintiff has not presented any evidence suggesting that the Ridgewood Defendants' level of supervision was unreasonable. Accordingly, Plaintiff's negligent supervision claim must fail.

## C. *Count V–Negligence*

■ In Count V of the Amended Complaint, Plaintiff argues that the Ridgewood Defendants owed Plaintiff a duty to deter-

mine, with a reasonable degree of certainty, that: 1) he was an accredited investor; 2) he possessed requisite investment sophistication to comprehend the significance of purchasing unregistered securities; and, 3) he was provided with information regarding the unregistered securities sufficient to allow him to fully evaluate the risks inherent in purchasing the unregistered securities.[12] Plaintiff contends that the Ridgewood Defendants violated this duty by failing to take adequate steps to verify his financial and investment sophistication and his understanding of the significance and/or consequences of purchasing unregistered securities.

Assuming, arguendo, that the Ridgewood Defendants had the duty asserted by the Plaintiff, the factual record is devoid of evidence that the Ridgewood Defendants violated this duty. On the contrary, as discussed at length in the Section III.A.1. of the instant memorandum and order, the Ridgewood Defendants took *extensive* measures to ensure that potential investors were made aware of the speculative, illiquid nature of the Trust shares. Moreover, the Ridgewood Defendants required that Plaintiff complete and *sign* a detailed

Investor Questionnaire which elicited information sufficient to determine whether he possessed the degree of financial sophistication and/or wealth necessary to qualify as an "accredited investor" under applicable statutes.[13] These measures were more than adequate to comply with the duty of care identified by the Plaintiff. Hence, there has been no breach of duty,[14] and Plaintiff's negligence claim is without merit.

## IV. CONCLUSION

For the foregoing reasons:

1. The Ridgewood Defendants' Motion for Summary Judgment is GRANTED.

2. By March 15, 2001, Plaintiff shall advise the Court of the status of its claim against all other defendants.

---

**12.** Plaintiff appears to argue that COMAR § 02.02.04.15, mandating issuer compliance with the anti-fraud provisions of the Maryland Securities Act, articulates the appropriate standard of care. The Court assumes, arguendo, that the standard of care identified by Plaintiff is correct.

**13.** Plaintiff argues that Keating completed the Investor Questionnaire, and that he merely signed the signature page, unaware that there were other pages. Plaintiff's claim is belied by the fact that the signature page contains an acknowledgment that "the answers to the above questions, and the information provided herein, are complete and correct." Mem. In Supp. Of The Ridgewood Def. Mot. for Summ. J., Ex. E at 10. Plainly, this statement alone would be sufficient to make Plaintiff aware that there were other pages. However, even assuming that Plaintiff blindly signed the

signature page of the Investor Questionnaire, this does not establish that the measures undertaken by the Ridgewood Defendants to ensure financial and investment sophistication were inadequate.

**14.** Even if it was determined that the Ridgewood Defendants breached the duty to ensure that Plaintiff had the requisite financial and investment sophistication, Plaintiff's negligence claim must fail because Plaintiff cannot establish causation. Plaintiff does not (and cannot) argue that he is not an "accredited investor" under applicable securities law. Indeed, Plaintiff admitted the facts necessary to qualify him as an "accredited investor" during his deposition. *See* Mem. In Supp. Of The Ridgewood Def. Mot. for Summ. J., Ex. C at 101, 196–98, 226–29. Hence, there can be no argument that alleged breach was the proximate cause of Plaintiff's damage.