827 A.2d 887

Richard E. BROOKS

v.

EUCLID SYSTEMS CORPORATION, et al.

No. 0298, Sept. Term, 2002.

Court of Special Appeals of Maryland.

June 26, 2003.

492

Thomas C. Costello (John H. West, III, West & Moore, LLC, on brief), Baltimore, for appellant.

Dana Whitehead McKee (Brown, Goldstein & Levy, LLP, on breif for Cyclean, Inc. and Cyclean of Los Angeles, LLC), Baltimore, for appellees.

Robert T. Shaffer, III (John J. Connolly, Murphy & Shafer, on brief for Ridgewood Power Trust IV and Ridgewood Power LLC, Patrick James Attridge, King & Attridge, Rockville, on brief for Euclid Systems Corp.), for appellees.

Argued before ADKINS, SHARER, SMITH, and MARVIN H., (Retired, Specially Assigned) JJ.

ADKINS, J.

When he retired at age 55, welder Richard E. Brooks, appellant, decided to invest some of his accumulated retirement savings through his investment and financial advisor Michael P. Keating. Like many other unfortunate investors, Brooks later learned that Keating materially misrepresented the nature and suitability of the investments that he arranged for Brooks to purchase. Instead of the low risk, modest income portfolio that Brooks requested, Keating succeeded in investing, and ultimately losing, Brooks' retirement savings in

unregistered, illiquid, speculative, high risk securities that were to be offered and sold only to "accredited investors."[1]

Brooks understandably sued Keating and made a claim against Keating's employer, Delta Equity Services Corporation ("Delta").[2] He also sued the issuers of the securities, including appellees Euclid Systems Corporation ("Euclid"), Ridgewood Power Trust IV/Ridgewood Power LLC ("Ridgewood"), and Cyclean, Inc./Cyclean of Los Angeles, LLC ("Cyclean")(collectively sometimes referred to as "Issuers"). The Circuit Court for Baltimore County granted summary judgment in favor of all three Issuers. Brooks then obtained a judgment against Keating.

Brooks now appeals the judgments entered in favor of all three Issuers,[3] claiming that the summary judgment record presented a jury question on the following issues:

 I. Was Keating, in his capacity as an employee of Delta, acting as an agent of the Issuers?

 II. Was either Keating or Delta an implied agent of the Issuers based on apparent authority to conduct the Issuers' business?

 III. Did the Issuers fail to disclose material facts in connection with their offer and sale of the securities that Brooks purchased?

 IV. Were the Issuers negligent in the manner in which they offered and sold their securities?

We agree with the circuit court that Keating was neither an actual nor an apparent agent of the Issuers, and that there was no material dispute of fact preventing summary judgment on Brooks' vicarious liability negligence claims against them.

---

1. *See* 17 C.F.R. § 230.501(a)(defining "accredited investor" as *inter alia* an individual with a net worth of $1 million and/or annual income of $200,000).

2. Brooks settled with Delta.

3. Keating is not a party to this appeal. We have reordered and rephrased the issues raised by Brooks.

We agree with Brooks, however, that the circuit court failed to address his direct liability claims based on the nondisclosure allegations in his complaint. Accordingly, we must vacate the judgments on Counts I and II. We shall remand those counts for further proceedings consistent with our discussion of the substantive question that the circuit court did not decide.

## FACTS AND LEGAL PROCEEDINGS[4]

After retiring from 28 years of work at Baltimore Aircoil, Inc. on August 31, 1995, Brooks took a lump sum distribution totaling $260,000 from his retirement account. Following through on recommendations from co-workers, he sought investment advice from Keating. Brooks told Keating that he wanted his retirement funds invested safely to preserve principal and to generate some income. Keating assured Brooks that he would find investments that protected his capital but yielded a modest return. As a result, Brooks placed his trust in Keating's investment advice, and employed him as a tax preparer as well.

Keating undisputedly recommended and arranged Brooks' purchases of inappropriate securities, including the securities offered by these three Issuers. Keating told Brooks that each of these investments was safe and suitable. He informed Brooks that he would have to sign or initial certain "paperwork," which was merely a routine procedure that did not require him to actually review the wording of the documents. Keating only showed Brooks the pages that needed a signature or initial, and did not give Brooks an opportunity to review the entire document.

Brooks signed and initialed these pages on the understanding that he was simply indicating his willingness to purchase the securities based on the information supplied by Keating. The documents that Keating fraudulently induced Brooks to

---

4. Our review of the summary judgment record necessarily reflects facts and inferences that are most favorable to Brooks, as the party opposing summary judgment. *See Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990).

sign were actually "Subscription Agreements" for the Issuers' securities, and documents giving false information about Brooks' income and assets.

All of these securities were unregistered, illiquid, speculative, and high risk investments designed solely for "accredited investors" with substantial income, assets, and investment experience. Brooks, a high school graduate with no investment experience, was not the type of wealthy and "sophisticated" investor who qualified as an accredited investor and generally purchased such high risk securities as part of a balanced portfolio of investments. He did not realize the high risk nature of these securities, or that Keating misrepresented information about the securities and his qualification to buy them. Nor, he claimed, did he understand that the Issuers would rely on his execution of these documents as verification that he appreciated the risky nature of the investment and that he had the income and assets that Keating listed in the subscription documents.

Brooks lost his entire $25,000 investment in each of the securities offered by the three Issuers.[5] He filed a complaint in the Circuit Court for Baltimore County, asserting claims for intentional misrepresentation, negligent misrepresentation, and negligence in the offer and sale of the securities. In addition to suing Keating and Delta, Brooks named these three Issuers as defendants. Admitting that there was no direct misrepresentation by the Issuers, he sued them for misrepresentation on the theory that Delta and Keating were their actual or apparent agents.

Each of the Issuers moved for summary judgment on the ground that they did not have a principal-agent relationship with Delta or its employee Keating. In opposition to these motions, Brooks pointed to the selling agreements that each Issuer had with Delta as evidence of a principal-agent relationship. He also pointed to other evidence of direct contact between the Issuers and Keating, which he asserted was

---

5. Brooks did receive distributions from Cyclean, totaling $1,705.48.

sufficient to raise an inference that there was an actual or apparent agency relationship.

The circuit court rejected that theory. It concluded that the Issuers could not be vicariously liable for any intentional or negligent misrepresentation that Keating made, because neither Keating nor Delta was an actual or apparent agent of these Issuers. In addition, the court found that there were no "allegations that written materials issued by these [d]efendants were false or misleading." It granted summary judgment in favor of each Issuer on all of Brooks' claims.

After settling with Delta and obtaining a judgment against Keating, Brooks noted this appeal. We shall discuss additional facts and documents as they pertain to the individual Issuers.

## DISCUSSION

Brooks sued all three Issuers for intentional misrepresentations and omissions of material fact (Count I), negligent misrepresentations and omissions of material fact (Count II), and negligence in the offer and sale of their securities (Count III). Although none of the Issuers are related, the issues and facts that Brooks raises in this appeal significantly overlap. We shall examine these questions as they relate to each Issuer.

## I.

### Euclid

Euclid develops and markets eye care industry products. In an effort to develop "corneal topographers" that shape contact lenses to individual corneas, Euclid decided to raise capital by offering stock through a private offering to accredited investors.

### Euclid's Offering Memorandum

Euclid issued an August 15, 1996 Confidential Offering Memorandum (the "Offering Memo"). The lengthy Offering

Memo provided detailed information about the company, its business plan, and its key executives. It also included many cautionary statements about the nature and risks of the investment:

- On the cover page, Euclid advised prospective investors that,

**IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE RISKS INVOLVED. SEE RISK FACTORS.**

- On page two, Euclid informed prospective investors that "Subscriptions will be received subject to rejection or allotment in whole or in part at any time in the sole discretion of the Company. Investment is subject to satisfaction of the suitability requirements set forth herein."

- On page six, Euclid cautioned:

AN INVESTMENT IN THE COMPANY INVOLVES SUBSTANTIAL RISKS AND IS LIMITED TO ACCREDITED INVESTORS MEETING THE SUITABILITY STANDARDS DESCRIBED IN THIS CONFIDENTIAL OFFERING MEMORANDUM. NO MARKET EXISTS OR IS LIKELY TO DEVELOP FOR THE SALE OF CONVERTIBLE PREFERRED STOCK OR THE COMMON STOCK INTO WHICH THE CONVERTIBLE PREFERRED STOCK IS CONVERTIBLE, AND THE CONVERTIBLE PREFERRED STOCK WILL BE TRANSFERABLE ONLY UNDER CERTAIN LIMITED CONDITIONS. PROSPECTIVE INVESTORS ARE ENCOURAGED TO OBTAIN THE ADVICE OF QUALIFIED PROFESSIONALS BEFORE DECIDING TO INVEST.

THIS CONFIDENTIAL OFFERING MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY CONVERT-

IBLE PREFERRED STOCK TO ANY PERSON WHO IS NOT AN ACCREDITED INVESTOR AND HAS NOT COMPLETED AND RETURNED A PURCHASER QUESTIONNAIRE AND SUBSCRIPTION AGREEMENT IN THE FORM REQUIRED BY THE COMPANY....

ANY WRITTEN OR ORAL PREDICTIONS OR REPRESENTATIONS WHICH DO NOT CONFORM TO THOSE CONTAINED IN THIS CONFIDENTIAL OFFERING MEMORANDUM SHOULD BE DISREGARDED AND THEIR USE IS A VIOLATION OF THE LAW.

- On page 11, in a summary of the offering, Euclid described certain **"Risk Factors,"** stating that

[t]his Offering involves a high degree of risk, including the Company's lack of profitability, inadequate dividend coverage, discretionary use of proceeds, possible regulatory constraints and possible need for additional financing. See "Risk Factors."

- On page 13, immediately following the offering summary, Euclid warned potential investors to carefully read about and weigh the investment risks based on information set forth in the Offering Memo or provided by Euclid:

READ THIS MEMORANDUM CAREFULLY BEFORE MAKING ANY INVESTMENT DECISION, ESPECIALLY THE SECTION ENTITLED **RISK FACTORS**.... INVESTORS WILL BE REQUIRED TO REPRESENT THAT THEY MEET CERTAIN FINANCIAL REQUIREMENTS AND THAT THEY ARE FAMILIAR WITH AND UNDERSTAND THE TERMS, RISKS AND MERITS OF THIS OFFERING. OFFERS ARE MADE ONLY TO PERSONS WHO MEET THE QUALIFICATIONS DESCRIBED UNDER **INVESTOR SUITABILITY REQUIREMENTS.**

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS

INVOLVED.... AN INVESTMENT IN THE CONVERTIBLE PREFERRED STOCK INVOLVES SUBSTANTIAL RISKS AND IS ILLIQUID. INVESTORS WILL BE REQUIRED TO REPRESENT THAT THEY ARE ABLE TO BEAR THE ECONOMIC RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD, THE POTENTIAL LOSS OF THEIR ENTIRE INVESTMENT AND THAT THEY (OR PERSONS ACTING ON THEIR BEHALF) HAVE SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS SO AS TO BE CAPABLE OF UNDERSTANDING THE TERMS AND RISKS OF THIS OFFERING. **SEE RISK FACTORS**....

Prospective investors must not rely upon any representations or information other than as set forth in this Memorandum and in documents furnished by the Company upon request.

Each offeree and any purchaser representative is invited during the Offering and before purchasing any Convertible Preferred Stock to ask questions of, and to obtain additional information from, the Company concerning the terms and conditions of the Offering. The Company and any other relevant matters (including, but not limited to, additional information to verify the accuracy of information in this Memorandum)....

The offeree agrees to return this Memorandum and all other related documents to the Company immediately if the offeree does not meet the requirements set forth under **Investor Suitability Requirements** or if the offeree declines to invest. (Emphasis in original.)

- On pages 14 and 15, Euclid detailed the **"INVESTOR SUITABILITY REQUIREMENTS,"** which restricted the offering to accredited investors with either (1) "individual income ... of more than $200,000 in each of the preceding two years," or "joint income ... of more than $300,000 in each of the preceding two years" with a reasonable expectation of "joint income of more than $300,000 in the current year[,]" or (2) "an individual net

worth, or together with their spouse ... a combined net worth in excess of $1,000,000." Euclid also advised that "[t]he Company has reserved the right to reject a subscription for Convertible Preferred Stock for any reason in its sole discretion[,]" and that it "intends to exercise this right to the extent necessary to comply with certain provisions of ERISA, tax and securities laws."

- On pages 17 through 19, Euclid described the **"RISK FACTORS"** of the investment. In the first paragraph, Euclid warned:

**INVESTMENT IN THE CONVERTIBLE PREFERRED STOCK INVOLVES SUBSTANTIAL RISKS, SOME OF WHICH ARE SUMMARIZED BELOW. PROSPECTIVE INVESTORS SHOULD CAREFULLY CONSIDER THE FOLLOWING RISKS, AMONG OTHERS, CONCERNING THE COMPANY AND THE OFFERING PRIOR TO INVESTING.**

- In the ensuing paragraphs, Euclid identified and discussed some of the specific, currently identifiable risks.[6]

---

**6.** Euclid specifically advised investors that:

- it was a "[d]evelopment [s]tage [c]ompany" with an "[e]xpectation of [f]uture [l]osses[;]"
- its annual dividend coverage might be "[i]nadequate[;]"
- the company "will be required to obtain additional financing" to implement its "business strategy fully[;]"
- "[t]he Company's success depends significantly" on "Key Executives[;]"
- it would have to develop and test "sophisticated, proprietary software" costing "approximately $200,000," of which only $30,000 had been paid;
- "[t]he Company's business strategy is dependent upon the successful commercial exploitation of multiple, patented technologies" that others might also use to develop competing products;
- the "[i]ntense competition," "[r]apid [t]echnological [c]hange[,] and [r]isk of [o]bsolesence" "could render the Company's technology and products currently under development obsolete and unmarketable[;]"
- "failure to receive FDA approval ... would have a material adverse effect on the ability of the Company to implement its business strategy[;]"

- On page 34, in setting forth the "Terms of the Offering and Plan of Distribution," Euclid again advised that "[t]he Convertible Preferred Stock is being offered by the Company subject to the right of the Company in its sole discretion to reject subscriptions." It also stated that the stock "will be sold only to Qualified Investors who demonstrate they are accredited investors meeting the criteria set forth under **Investor Suitability Requirements.**"

- On page 35, Euclid explained "How to Subscribe for Convertible Preferred Stock[.]" These terms stated that Euclid would require prospective investors to submit a detailed "Subscriber Questionnaire and Subscription Agreement" that was included with the Offering Memo. Euclid again explicitly "reserve[d] the right to reject any subscription for any reason whatsoever."

### Euclid's Selling Agreement

On July 10, 1996, Euclid made Diversified Investment Partners, Inc. ("Diversified") its exclusive financial advisor. Under the terms of that agreement, Diversified introduced Euclid to securities broker-dealers who specialized in private placement investments such as Euclid's. One of those broker-dealers was Delta.

Euclid entered into "best efforts selling agreements" with Delta and another broker-dealer. Under the terms of those agreements, the broker-dealers had "the non-exclusive right to

---

- "the Company's executive officers, directors and principal stockholders" would maintain control over "most, if not all, matters requiring approval by stockholders[;]"
- "[t]he offering price . . . do[es] not necessar[ily] bear any relationship to the Company's assets, book value, results of operations or other generally accepted criteria of value[;]"
- "there is no public market for" the stock and "no assurance that such a market will ever develop[;]"
- there was no assurance that all of the capital the company sought to raise via the offering would be raised, which would leave the company without adequate funds to implement its business plan; and
- the stock could not be sold or transferred, so that "Investors should be aware that they will be required to bear the financial risks of this investment for an indefinite period of time."

solicit subscriptions" and "agree[d] to use ... best efforts to obtain such subscriptions." "It [was] understood that [Euclid] reserve[d] the right in its sole discretion to refuse to sell any Shares to any person at any time." For each subscription that Euclid accepted, the broker-dealer earned certain percentage commissions.

In return for the opportunity to sell Euclid's securities, Delta represented and warranted that it "or its agent" would give the Offering Memo to each offeree "concurrently with making any offer[,]" and that it would "make no representations with respect to [Euclid] or its business and affairs other than the representations set forth in the Confidential Offering Memorandum or the sales literature authorized for use in connection with the offering, or such other information as is specifically authorized by the Company and its legal counsel." In addition, Delta warranted that "its agents will comply with all applicable provisions of" federal and state securities laws.

The Selling Agreement provided *inter alia* that,

[w]ith respect to any solicitations or offers made by [Delta] or its agents on behalf of [Euclid], [Delta] represents, warrants and covenants as follows:

(1) Neither [Delta] nor any person acting on its behalf ("agent") will offer the Shares by any means of any form of general solicitations or general advertising.... Neither [Delta] nor agent thereof will sponsor or hold any seminar or meeting at which the persons attending have been invited by any general solicitation or general advertising.

(2) [Delta] or its agent will cause each person interested in acquiring a Unit to complete and execute a Purchaser Questionnaire, ... and will deliver the completed Purchaser Questionnaire to [Euclid] at the time the subscription materials are delivered to the Company to determine whether such person is qualified to acquire an interest in the Company.

(3) [Delta] or its agent will furnish to each offeree, concurrently with making any offer to such offeree ... a copy of the Confidential Offering Memorandum and any supple-

ment or amendment thereto. [Delta] or its agent will make no representations with respect to the Company or its business and affairs other than the representations set forth in the Confidential Offering Memorandum or the sales literature authorized for use in connection with the offering, or such other information as is specifically authorized by the Company and its legal counsel.

(4) [Delta] and its agents will comply with all applicable provisions of [securities laws]. . . .

The agreement also included cross-indemnification and contribution clauses. Delta indemnified Euclid against claims

(1) arising out of or based upon a misrepresentation of material fact by Broker or its agents in connection with the sale of the Shares unless such misrepresentation(s) was the direct result of misleading information provided in writing to Broker or its agents by [Euclid] or any agent thereof; or (2) arising out of or based upon the failure of Broker or any of its agents to comply with any covenant, or the breach of any representation or warranty, set forth in this Agreement.

### Euclid's Subscription Documents

Brooks signed the requisite Subscriber Questionnaire/ Subscription Agreement, which is dated "10–7–96." By doing so, he agreed that:

- he had received and read the Offering Memo;
- he had completed the Subscriber Questionnaire;
- the information in both documents was "complete and accurate[;]"
- he had "considered . . . the information set forth [in the Offering Memo] under 'Risk Factors[;]' "
- he "understood" that "the Shares are speculative investments which involve a high degree of risk of loss of any investment therein[;]"
- he was "an accredited investor[;]"

- he was "able to bear the economic risk of his investment in [Euclid] and to hold his shares for an indefinite period of time."

Brooks also placed his initials next to two specific provisions of the Subscription Agreement. The first stated that Brooks' net worth was at least $1,000,000. The second represented that he had

such knowledge and experience in financial and business matters and in private placement investments in particular that [he was] capable of evaluating the merits and risks of an investment in the securities and [did] not desire to use a purchaser representative in connection with evaluation such merits and risks.

On the next page, Keating verified that he was "familiar with [Brooks'] financial affairs and investment objectives[,]" that the investment was "suitable" for Brooks, and that Brooks "underst[ood] the terms, and [was] able to evaluate the merits, of this offering."

### Euclid's Dealings With Keating

Testifying in a deposition in an unrelated case involving another investor procured by Keating, Euclid's CEO Bruce DeWoolfson said that he first met Keating in November 1996. He acknowledged that he spoke with Keating more than 20 times by phone. He also met with Keating and prospective investors that Keating brought in "several" times, both at Keating's office and at the company facilities.

In May 1998, Keating brought prospective investors to Euclid's annual meeting. By that time, Euclid had discussed with Keating the possibility of his becoming a company director. But shortly before that meeting, Euclid "learned from the Maryland Attorney General's Office ... that Mr. Keating was going to [lose] his brokerage license and had engaged in questionable sales practices." Instead of making him a director, Euclid "compromised and gave him a title of financial advisor to the company."

DeWoolfson explained that

the history of that was that Mr. Keating took a very active interest in [Euclid]. And he was the best producer we had in terms of raising capital for us. And he maintained that he needed to know ... very closely—the progress and the status of the company so that he could keep his investor clientele informed of the progress of the company.

Keating, however, was "never paid for that. And he never had any substantive involvement. It was ... an honorary title only, as a face-saving gesture for him." Euclid then "learned the extent of his difficulties," and "terminated" its relationship with Keating "within sixty days of the time" his legal troubles were announced.

## A.

### Actual Agent

Brooks seeks to establish the existence of a principal-agent relationship because, under established principles of agency law, if Euclid was Delta's or Keating's principal, then it might be vicariously liable for their misrepresentations, nondisclosures, violations of securities laws, or negligence. *See Sanders v. Rowan,* 61 Md.App. 40, 50, 484 A.2d 1023 (1984).

 An agency relationship may be created by written agreement or by conduct. *See Green v. H & R Block, Inc.,* 355 Md. 488, 503, 735 A.2d 1039 (1999). The classic three factors considered in determining whether an agency relationship exists are whether:

(1) [t]he agent is subject to the principal's right of control;

(2) the agent has a duty to act primarily for the benefit of the principal; and

(3) the agent has the power to alter the legal relations of the principal.

*Schear v. Motel Mgmt. Corp. of Am.,* 61 Md.App. 670, 687, 487 A.2d 1240 (1985); *see Forrest v. P & L Real Estate Inv. Co.,* 134 Md.App. 371, 396, 759 A.2d 1187 (2000). These are not exclusive factors; "rather than being determinative, the three factors should be viewed within the context of the entire

circumstances of the transaction or relations." *Green,* 355 Md. at 506, 735 A.2d 1039.

■ Whether there is adequate evidence of an agency relationship to survive summary judgment is a question of law for the court. *See Kersten v. Van Grack, Axelson & Williamowsky, P.C.,* 92 Md.App. 466, 473–74, 608 A.2d 1270 (1992). The circuit court found that Euclid did not "retain sufficient control over Mr. Keating to deem it liable for his actions, statements or misrepresentations." Brooks disputes that finding. He contends that "there is no question[,]" based on the selling agreement and Euclid's direct contacts with Keating, "that a jury could find that Delta was acting as the agent of ... Euclid in connection with the offer and sale of the securities to Brooks."

We agree with the circuit court that neither the Selling Agreement nor the evidence regarding Euclid's relationship with Delta and Keating raised a material factual dispute as to whether there was a principal-agency relationship at the time Keating invested in Euclid.

### 1.

### Selling Agreement

■ A principal's right to control its agent is of paramount importance, but that control may be exercised in myriad ways. *See Schear,* 61 Md.App. at 687, 487 A.2d 1240.

A principal need not exercise physical control over the actions of its agent in order for an agency relationship to exist; rather, the agent must be subject to the principal's control over the result or ultimate objectives of the agency relationship.... The level of control may be very attenuated with respect to the details. However, the principal must have ultimate responsibility to control the end result of his or her agent's actions; such control may be exercised by prescribing the agent's obligations or duties before or after the agent acts, or both.

*Green,* 355 Md. at 507–08, 510, 735 A.2d 1039.

■ The circuit court concluded that Delta operated as an independent contractor and that Delta, rather than any of the

Issuers, was responsible for supervising Keating and his representations to investors. The only control that Euclid had over the manner in which Delta and Keating represented the investment was through the terms of the Selling Agreement. That agreement explicitly required Delta and its agents to comply with applicable securities laws and to present the Offering Memo to all prospective subscribers. Because these contractual requirements merely restated legally imposed duties governing every securities transaction, the Selling Agreement did not give Euclid sufficient control over Delta or Keating to create a principal-agent relationship.

In Brooks' view, the Selling Agreement raises an inference that Delta and Keating were Euclid's agents. In support, Brooks points to specific terms in that agreement providing that

> Delta could only offer and sell the securities to investors who met the financial suitability and other offeree standards set forth in the [Offering Memo]; Delta was prohibited from advertising the availability of securities by way of newspaper, television or media; Delta could only present prospective investors with written materials previously approved by [Euclid]; Delta was required to present prospective investors with the [Offering Memo] prior to sale; Delta was required to collect the Investor Subscription Documents and funds from prospective investors and forward them to [Euclid]; and Delta was required to ensure that the information contained on the subscription documents was accurate.

We review these terms in the context of the entire Selling Agreement, and in light of the Offering Memo and subscription documents to which the Selling Agreement refers. We are not persuaded that a reasonable juror could infer that the Selling Agreement created a principal-agent relationship between Euclid and either Delta or Keating.

The Selling Agreement did not give Euclid the right to select, supervise, discipline, or train the individual registered representatives who worked for Delta. Thus, Euclid had no right to control Keating or other Delta employees.

Similarly, with respect to Delta, the agreement did not give Euclid the right to control Delta's conduct. We agree with the circuit court that the terms Brooks cites as evidence of Euclid's control over Delta merely required Delta and its agents to comply with either preferred practices in the private placement industry or applicable securities laws.[7]

In this case, the critical term of the Selling Agreement was that the offering could not be made to unaccredited investors. If not mandatory, that term is widely used throughout the securities industry by issuers attempting to secure and protect a Regulation D exemption from securities' registration requirements, and to avoid lawsuits such as this one, in which an unaccredited investor rightfully complains that the high risk and illiquid investment was not suitable for his portfolio. *See generally* 17 C.F.R. § 230.502(b) & note (although issuer is not required to furnish the specified information in Regulation D "when it sells securities ... to any accredited investor," issuer nevertheless "should consider providing [the same information it would provide to unaccredited investors] to accredited investors as well, in view of the anti-fraud provisions of the federal securities laws"); COMAR 02.02.04.15.A(2)(offering that complies with Maryland and federal regulations governing exempt securities offerings is nevertheless not exempt from anti-fraud provisions of Maryland Securities Act).

As for other terms of the Selling Agreement that Brooks cites as examples of "control" terms that were not specifically required by law, we do not view any of these terms as evidence of the type of control required to establish agency.

---

7. As Euclid points out, Securities and Exchange Commission regulations "control" the solicitation activities of all broker-dealers and registered investment advisors. *See, e.g.,* 17 C.F.R. § 230.501 *et seq.* ("rules governing the limited offer and sale of securities without registration under [Regulation D] of the Securities Act of 1933"). These regulations restrict the persons, circumstances, and the manner in which various private placements may be offered to investors, including some of the restrictions and requirements set forth in the cited terms from Euclid's Selling Agreement. *See, e.g.,* 17 C.F.R. § 230.502(c)("neither the issuer nor any person acting on its behalf shall offer or sell the securities by any form of general solicitation or general advertising").

In his reply brief, Brooks points out that "there are no federal or state securities laws which obligated ... Euclid to place" restrictions (1) prohibiting Delta from making comments inconsistent with the Offering Memo, or offering the securities in a manner inconsistent with the Offering Memo; (2) requiring that Delta have the prospective investor complete the subscription documents and then forward those documents and the deposit; (3) prohibiting Delta from using written materials that were not approved by Euclid; and (4) requiring Delta to maintain files on investors who purchased the securities. All of these terms in the Selling Agreement were patently designed to preserve and protect the exempt status of the offering, and to ensure compliance with anti-fraud principles applicable to the offering, by ensuring that investors understood that Delta and its representatives **did not have any authority** to change the terms of the offering. In this respect, these terms actually undermine rather than support the agency inference that Brooks seeks to draw.

■ The United States District Court for the District of Maryland reviewed a substantively identical selling agreement between Ridgewood and Delta in a suit filed by another investor victimized by Keating. In *Schweizer v. Keating,* 150 F.Supp.2d 830, 839–41 (D.Md.2001), that court rejected an analogous contention that these contract terms raised an inference that the issuer had a principal-agent relationship with Delta or Keating. We concur with the federal court's observation that "[t]he reservation of some control over the manner in which work is done does not destroy the independent contractor relationship where the contractor is not deprived of his judgment in the execution of his duties." *Id.* at 840 (citing *Taylor v. Local No. 7 Int'l Union of Journeymen Horseshoers,* 353 F.2d 593, 597 (4th Cir.1965)). We also concur with that court's explanation of why these terms do not preclude summary judgment. As Judge Garbis emphasized for the federal court:

> In the ... sale of securities by private offering, the contractual provisions at issue are insufficient to establish ... the right to control Delta and its representatives.

Securities sold by private offering are subject to numerous "prophylactic" regulations designed to ensure that they are sold to informed, sophisticated investors. *See generally* Securities Act of 1933, as amended by Securities Exchange Act of 1934, 15 U.S.C. § 77a *et seq.;* 17 C.F.R. § 230.501 *et seq.* Most of the "control" provisions identified by Plaintiff are identical to those imposed under the applicable securities laws, and enable the offering to retain exemption from registration.

Plaintiff has not presented any evidence suggesting that the restrictions placed upon Delta and its employees were atypical of those imposed upon independent broker/dealers selling privately offered securities. Indeed, responsible issuers would be expected to include such contractual provisions in selling agreements and related documents in order to ensure compliance with the law.

Delta and its representatives retained a significant degree of discretion in selecting potential investors to whom trust shares would be offered and the manner in which the investment would be presented to the prospective buyer; hence, there is no basis for a determination that they were deprived of their discretion. Plaintiff's assertion that the ... Defendants controlled Delta and its representatives in a manner that is indicative of [an agency] relationship is without merit.

*Id.*

As more proof of control, Brooks cites the commissions that Delta and Keating received as a result of Brooks' purchase of Euclid securities. Under the terms of the Selling Agreement, however, such payments did not give Euclid the type of control that principals exercise over their agents. There were no "quotas" that Delta or Keating were contractually obligated to meet. Nor was there any commission or other payment for merely presenting the investment opportunity to a client. Moreover, at all times, Delta and its agents remained free to decide whether to recommend the investment. For these reasons, we agree with the circuit court that no reasonable

juror could infer from the terms of Euclid's Selling Agreement that Euclid had a principal's right to control Delta or Keating.

That freedom and discretion that Delta and Keating exercised over interactions with investor clients also undermines Brooks' claim that Delta was obligated to act primarily for the benefit of Euclid. Delta and Keating were not contractually or financially obligated to recommend the Euclid offering to any of their clients. Nor were they required to perform any other services on Euclid's behalf.

To the contrary, both the agreement and the incorporated terms of Euclid's Offering Memo recognize that, as investment advisors acting as "purchaser representatives," Delta and Keating were obligated to act primarily for the benefit of their investor clients. Thus, their primary duty was not to sell Euclid's securities, but rather to give Brooks appropriate advice and assistance in finding suitable investments for his retirement money. *See, e.g., Brewster v. Maryland Sec. Comm'r,* 76 Md.App. 722, 726–27, 548 A.2d 157 (1988), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989)(" 'In recommending to a customer the purchase, sale or exchange of any security, a [registered representative] shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs' ")(quoting National Association of Securities Dealers Rules of Fair Practice). Indeed, that was the factual basis for the jury's ultimate finding that Keating breached his fiduciary duty to Brooks.

Similarly, we see nothing in the Selling Agreement, the Offering Memo, or subscription documents that reasonably could be construed as evidence that Delta and its agents had the power to alter Euclid's legal relations. The Selling Agreement makes it clear that neither Delta nor Keating had the authority to vary the terms of the offering. Euclid retained complete control over the terms on which its stock was

offered, and sole discretion to accept or reject a particular subscription application for any reason whatsoever.

As the Selling Agreement, Offering Memo, and subscription documents also make clear, Delta and its agents were not authorized to make representations on Euclid's behalf. These documents repeatedly state in plain language that investor decisions should be based solely on information provided by Euclid.

For all of these reasons, we agree with the circuit court that there was no documentary evidence of the type of control, duty, or power to alter legal relations that are hallmarks of a principal-agent relationship.

### 2.

### Direct Contact

Brooks alternatively relies on the testimony of Euclid's CEO in an unrelated case as evidence that Euclid developed an "extra-contractual" principal-agent relationship with Keating. We also are not persuaded that Euclid's course of direct dealing with Keating raised a material dispute regarding agency status. We explain.

In the cited testimony, Euclid's CEO Bruce DeWoolfson explained that he did not meet Keating until November 1996, a month **after** Brooks submitted his Subscription Agreement, which is dated October 7, 1996. To be sure, by May 1998, DeWoolfson had regular direct contact with Keating. But we need not consider the potential significance of those "after-the-fact" contacts in determining whether summary judgment was appropriate. Indeed, any principal-agent relationship that arguably developed after November 1996 only tends to confirm that there was no principal-agent relationship in October 1996, when Brooks invested in Euclid.

Brooks has not cited any other evidence of direct dealing that might have given rise to an agency relationship at the time that Keating was advising Brooks to invest in Euclid. Accordingly, we agree with the circuit court that DeWoolfson's contacts with Keating did not create a factual dispute material

to determining whether Delta and Keating were Euclid's agents.

## 3.

## Escrow

■ In his reply brief and at oral argument, Brooks pointed to evidence that "Euclid allowed Delta to collect money on [its] behalf and deposited those monies into bank accounts which [Euclid] controlled," as proof that "Delta had the ability to alter the legal relations of ... Euclid." We do not agree that the existence of such an escrow reasonably can be construed as proof that Delta or Keating had the power to affect Euclid's legal relations.

The Subscription Agreement and Offering Memo conditioned the offering on a minimum threshold amount of capital—140,000 shares sold before November 30, 1996. Investors who submitted subscription applications before the minimum threshold was reached wrote checks payable to "EUCLID Systems Escrow Account." Those checks were required to be deposited into a dedicated escrow account at a designated third party bank, under the control of an independent escrow agent. Under the terms of the offering, the escrow agent could not release funds to Euclid until Euclid accepted the subscription and the minimum sales threshold was met. The Selling Agreement and Offering Memo prohibited Delta from accepting funds in any other manner, and from commingling those funds.

We have not been cited to any evidence that Delta or Keating did anything but deliver Brooks' check for deposit into the escrow account. This delivery cannot reasonably be characterized as "collecting for Euclid." To the contrary, the delivery was made on behalf of Brooks. Accordingly, we see nothing in the escrow arrangement to suggest that it gave Delta or Keating any actual or apparent power to affect Euclid's legal relations.

## 4.

## Ratification

 Brooks alternatively suggests that by accepting the subscription agreements submitted by Delta and Keating, as well as Brooks' money, Euclid ratified that "Delta had fulfilled the duties imposed by law upon . . . Euclid for the sale of these regulated securities." We again disagree.

Brooks' ratification argument rests on the premise that Euclid knowingly ignored that Delta and Keating failed to make offers only to accredited investors, failed to give prospective investors the Offering Memo concurrently with the offer, and failed to refrain from representations that were inconsistent with the Offering Memo. To establish ratification in these circumstances, then, Brooks must show that before Euclid accepted Brooks' subscription, it had actual knowledge that Keating lied about Brooks' net worth and experience before it accepted his subscription agreement, that it knew Keating did not timely give Brooks the Offering Memo, or that it knew Keating had misrepresented to Brooks the suitability of the investment. *Cf., e.g., Webb v. Duvall,* 177 Md. 592, 599, 11 A.2d 446 (1940)(" 'Acquiescence in, or the receipt and retention of the proceeds and benefits of, an unauthorized transaction do not amount to ratification if not accompanied by knowledge of the material facts concerning the transaction' ") (citation omitted).

We see no evidence raising an inference of such knowledge. DeWoolfson testified that it was spring of 1998 when he first learned that some of Keating's clients were not accredited investors. Brooks presented no evidence to contradict that testimony. Nor has he cited us to any evidence that Euclid was aware that Keating misrepresented the nature of the investment and failed to give Brooks the Offering Memo until he executed the Subscription Agreement.

The patent purpose of having both the investor and his account executive sign the Subscriber Questionnaire/Subscription Agreement—and in doing so, certify the statements therein and agree "to all of the terms and conditions" there-

in—was to ensure that every prospective investor directly assured Euclid that he or she was an accredited, experienced, suitable, and adequately informed investor. Without any evidence that Euclid was aware that the certifications submitted by Brooks, Delta, and Keating were false, its acceptance of Brooks' subscription cannot reasonably be construed as ratification.

### 5.

### Conclusion

For these reasons, we concur with the circuit court that Euclid did not exercise any "ultimate responsibility" over Delta or Keating, or otherwise define their ultimate objectives. *See Green,* 355 Md. at 510, 735 A.2d 1039. On this record, there was no material dispute over whether Euclid had an actual principal-agent relationship with Delta or Keating.

### B.

### Appearance Of Authority

Brooks also argues that, "[a]ssuming ... that the evidence established that Delta was an independent contractor," Euclid still might be liable to Brooks under the principles recognized in *Restatement (Second) of Agency* ("*Restatement*") sections 258 and 261.

Section 258 of the *Restatement* provides:

In the absence of an exculpatory agreement, **a principal authorizing a servant or other agent** to enter into negotiations to which representations concerning the subject matter thereof are usually incident is subject to liability for loss caused to the other party to the transaction by tortious misrepresentations of the agent upon matters which the principal might reasonably expect would be the subject of representations, provided the other party has no notice that the representations are unauthorized. (Emphasis added.)

Section 261 of the *Restatement* similarly provides:

**A principal who puts a servant or other agent** in a position which enables the agent, while apparently acting

within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud. (Emphasis added.)

As the highlighted text makes clear, liability under either of these sections presumes the existence of an agency relationship. For the reasons we explained above, there was no evidence of an agency relationship between Euclid and Delta or Keating, and hence no liability under these *Restatement* principles.

What is apparent from Brooks' brief is that he has confused the distinction between independent contractors and employee/servants, both of whom may be agents, with the more fundamental distinction between independent contractors who are agents and independent contractors who are not. To be sure, some independent contractors are classified as agents. We have explained that

the principal/agent relationship is a generic one—a genus, of which the master/servant relationship is a species. Thus, while all masters are principals and all servants are agents, there are some principals who are not masters and some agents who are not servants. Agents who are not servants are regarded as independent contractors.

*Sanders,* 61 Md.App. at 50, 484 A.2d 1023 (citations omitted).

Here, the circuit court's description of Delta as an "independent contractor" apparently led Brooks to view him as the species of independent contractor—agent that we described in *Sanders.* It is quite clear from the circuit court's ruling, however, that the court categorized Euclid as a second type of "independent contractor"-one from an entirely separate genus of "non-agents." "Not all independent contractors are agents. 'A person who contracts to accomplish something for another or to deliver something to another, but who is not acting as a fiduciary for the other, is a non-agent independent contractor.'" *Brady v. Ralph Parsons Co.,* 308 Md. 486, 510 n. 26, 520 A.2d 717 (1987)(quoting *Restatement* § 2 cmt. b, § 14N cmt. b). For example, " 'one who contracts for a stipulated price to build a house for another and who reserves

direction over the conduct of the work is an independent contractor; but he is not an agent, since he is not a fiduciary, has no power to make the one employing him a party to the transaction, and is subject to no control over his conduct.' " *Id.* (quoting *Restatement* § 2 cmt. b).

Because there was no agency relationship in this case, the principles cited in these *Restatement* sections do not warrant reversal of summary judgment. We are not persuaded otherwise by Brooks' complaints that Euclid

> placed Delta in a position to defraud third parties like Brooks by (1) providing Delta with the documentation to effectuate the sale of the securities; (2) providing Delta access to its officers, servants and employees to facilitate the sale of the securities; (3) blindly accepting as true the accuracy of the information contained in the documentation submitted by Delta; and (4) allowing Delta to collect the funds for the purchase of the securities.

We have already explained why neither Delta's role in providing documentation to its investor clients, nor the direct dealings between Euclid and Keating, nor Euclid's acceptance of Brooks' subscription, nor Delta's escrow raise an inference that Delta was acting as Euclid's actual agent. *See infra* Part I.A. That analysis required us to examine whether any reasonable person could view this evidence as an indication that Keating or Delta had authority to act for Euclid. For the same reasons we concluded that it could not, we also conclude that this evidence did not reasonably imply the existence of an agency relationship. *See, e.g., Homa v. Friendly Mobile Manor, Inc.,* 93 Md.App. 337, 359, 612 A.2d 322 (1992), *appeal dismissed,* 330 Md. 318, 624 A.2d 490 (1993)(only when alleged principal "knowingly permits" alleged agent to exercise authority or holds alleged agent out as having authority can agency relationship be implied).

## C.

### Material Nondisclosure

The circuit court granted summary judgment on Brooks' claims that Euclid omitted from its Offering Memo and sub-

scription documents "that the securities were unregistered, illiquid, speculative securities which should have only been offered and sold to individuals who satisfied the statutory definition of 'accredited investor.' " Brooks argues that the circuit court erroneously overlooked his material nondisclosure claim when it stated that "[t]here are no separate . . . allegations that written materials issued by [Euclid] were . . . misleading." As he points out, if such a claim is viable, it does not depend on the existence of a principal-agency relationship.

We agree that the circuit court failed to recognize and address his nondisclosure claim. We cannot affirm the grant of summary judgment for reasons other than those cited by the circuit court as grounds for its ruling. *See, e.g., Lovelace v. Anderson,* 366 Md. 690, 695–96, 785 A.2d 726 (2001)(appellate court should not speculate that summary judgment might have been granted on ground other than that cited by circuit court). We therefore must vacate the judgment on Counts I and II (fraudulent and negligent omission of material fact) of Brooks' complaint, and remand for a ruling on those claims.

For the guidance of the court and the parties on remand, however, we may address any issue that was raised but not decided below. *See* Md. Rule 8–131(a). In the interest of judicial economy, we shall exercise our discretion to do so here, because the record contains clear and undisputed evidence that the offering and subscription documents fully disclosed the speculative and illiquid nature of the investment.

The Offering Memo and subscription documents contain numerous detailed warnings to prospective investors about the high risk nature of the investment, as well as statements that the offering was restricted solely to accredited investors with a specified income or asset level. We set out many of these provisions above. We shall not review each one separately, because we are in complete agreement with the comprehensive analysis of these same terms by Judge Garbis in *Schweizer,* 150 F.Supp.2d at 839–42.

Moreover, even if Euclid omitted some material fact from its Offering Memo or subscription documents, we would still conclude that Brooks' nondisclosure claims must fail. Brooks admitted that he never read the Offering Memo or subscription documents. *A fortiori*, he cannot show that he actually relied on those documents in making his decision to invest. Without such reliance, Brooks cannot prevail on his claims for intentional and negligent nondisclosure. *See, e.g., B.N. v. K.K.*, 312 Md. 135, 151–53, 538 A.2d 1175 (1988) (actual reliance on materially incomplete representation is an essential element for nondisclosure claim).

## D.

### Negligence

Brooks also complains that summary judgment should not have been granted on his negligence claims against Euclid. Brooks' negligence claim is partially predicated on direct liability theories of material nondisclosure and failure to adequately supervise Delta and Keating, and partially predicated on vicarious liability theories of tortious conduct by Delta and Keating. We have already rejected all of these liability theories.

The only remaining direct liability allegation asserts that Euclid was negligent in selling to unaccredited investors, in violation of state and federal law. In Brooks' view, such an unlawful sale is *prima facie* evidence of negligence raising a jury question.

We disagree that, by itself, Euclid's sale to the "unaccredited" Brooks raises an inference that Euclid was negligent. We have been cited to no evidence from which a juror could infer that Euclid knew Brooks was not the accredited and informed investor that the subscription documents represented him to be. Moreover, as we detailed, Euclid included prominent, clear, and repeated warnings that the offering was restricted to accredited investors. It also required information and written certification from Brooks himself that he was an accredited investor who fully understood the risky and

illiquid nature of the investment. To verify Brooks' certification that he was an accredited and informed investor, Euclid also required written verification from both Delta and Keating.

In these circumstances, we conclude that Euclid did not have a duty to independently verify that the information Brooks, Keating, and Delta all certified was true and accurate was, in fact, true and accurate.

Brooks seeks to prevent Euclid from defending itself with these certifications. In Brooks' view, he cannot be fairly charged with knowledge of what was in the subscription documents and Offering Memo because Keating did not give him the Offering Memo before the purchase and prevented Brooks from reading the subscription documents. He argues that, because Euclid "hired" Delta to make sure that prospective investors received, read, and understood these documents before deciding to purchase, and because Keating fraudulently induced him to purchase without doing so, "the subscription agreements are voidable, and knowledge of the[ir] contents . . . cannot be imputed to him as a matter of law." We reject Brooks' argument for two reasons.

First, Euclid did not "hire" Delta to distribute and review these documents with prospective purchasers. Obviously, Delta and Keating were not contractually obligated to tell unaccredited investors about the Euclid offering; to the contrary, they were contractually obligated **not** to do so. Nor were they obligated to present the offering to their accredited investor clients. When Delta and its agents chose to present the Euclid investment opportunity, they did so in their fiduciary capacity as investment advisors, not as employees or agents of Euclid.

 Second, we reject Brooks' contention that Euclid cannot rely on his fraudulently induced signature and certifications in the subscription documents. Although a fraudulently induced contract is voidable, Brooks' reliance on that principle is misplaced. In these circumstances, the question is not whether **Brooks can be fairly charged with knowledge of**

**what he did not read** in the Offering Memo and subscription documents. Rather, the question is whether any juror could reasonably conclude that **Euclid can fairly rely on the knowledge it gained when it did read** those documents. In other words, we ask whether Euclid had a duty to ask Brooks whether he fully read, understood, appreciated, and stood by what he was signing, even though he certified in writing that he did.

This case is materially different from *Benjamin v. Erk*, 138 Md.App. 459, 771 A.2d 1106, *cert. denied*, 364 Md. 461, 773 A.2d 513 (2001), and other cases cited by Brooks for the proposition that he cannot be charged with knowledge of these documents because he was fraudulently induced to sign them. There, we recognized that a jury could find that it was reasonable for a party not to read a contract if the other party led him to believe that the contract was some other type of document, or that it said something different than what it said. *See id.* at 482, 771 A.2d 1106. Reduced to shorthand, the question in *Benjamin* was whether A, who was fraudulently induced by B into signing a contract with B, reasonably could have relied on B's fraudulent oral statements even though they contradicted the written terms of the contract that A did not read.

In contrast, here the question is whether Euclid could reasonably rely on the written terms of a contract that Euclid did read. We ask whether E, who was fraudulently induced by D into signing a contract with I, reasonably could have relied on I's written statements in the contract. The material distinction between this case and *Benjamin* is that in that case, a fraudulently induced party who did not read the contract sought to avoid knowledge of its contents, whereas in this case, an innocent party who did read the contract seeks a ruling that it was entitled to rely on what the contract said. *Cf. also Rossi v. Douglas*, 203 Md. 190, 199, 100 A.2d 3 (1953)(involving dispute solely between parties to contract, with no indication of fraudulent inducement); *Kolker v. Gorn*, 202 Md. 322, 331, 96 A.2d 475 (1953)(same).

As we explained, Brooks presented no evidence to suggest that Euclid knew Keating was withholding the Offering Memo, misrepresenting the investment, promoting it to his unaccredited clients, and falsifying the subscription documents. Thus, as Brooks concedes, Euclid accepted Brooks' subscription based on critical misrepresentations that Brooks, Keating, and Delta made in the subscription documents-including that Brooks had a million dollar net worth and that he was such a sophisticated investor that he did not even need assistance from a purchaser representative.

Accordingly, we agree with the circuit court that Euclid was not negligent in relying on those misrepresentations when it decided to accept Brooks' subscription. As a practical matter, Brooks is seeking a reward for not reading the subscription documents before he signed them, or, put conversely, Brooks is seeking to penalize Euclid for reading those same documents before it decided to accept Brooks' subscription. That is not a reasonable result. Even assuming that Brooks did not realize what he was telling Euclid when he signed and initialed the Subscription Agreement, Euclid cannot be faulted for reading and relying on that document in these circumstances.

We conclude that no juror reasonably could infer that Euclid breached any duty to Brooks by accepting his subscription on the basis of his executed and initialed representations in the Subscription Agreement.

## E.

## Conclusion

Given the detailed language in Euclid's offering and subscription documents and Euclid's Selling Agreement, the undisputedly false information that Brooks and Keating supplied to Euclid, and the lack of any evidence that Euclid was aware of either Keating's misconduct or Brooks' unaccredited status at the time it accepted Brooks' subscription, we conclude that the circuit court properly granted summary judgment on all of Brooks' claims against Euclid, with the exception of the non-

disclosure claims in Counts I and II. We shall affirm the judgments on Count III, and remand for additional proceedings consistent with this opinion on the nondisclosure aspects of Counts I and II.

## II.

### Ridgewood

Ridgewood offered private investments in business trusts that participate in the development, construction, and ownership of independent power projects throughout the nation. Keating arranged for Brooks to purchase 1/4 of a share in Ridgewood Electric Power Trust IV. In his Ridgewood Subscription Agreement, Brooks initialed a provision stating that he had a net worth in excess of one million dollars.

Brooks makes the identical arguments against the judgments in favor of Ridgewood that he made against the judgments in favor of Euclid. Although there are differences between Ridgewood's "Best Efforts Selling Agreement," offering memorandum, and subscription documents, and the analogous Euclid agreements that we reviewed in detail, Brooks recognizes that none of these differences is material to the outcome of this appeal.

Ridgewood's offering memorandum included similarly prominent warnings and notices regarding the nature and conditions of the investment.[8] Its "Best Efforts Selling Agreement" also made it clear that Delta and its agents were "independent contractors" who were not agents.[9] Its subscription documents plainly state that the investment is illi-

---

**8.** Ridgewood's offering memorandum began with a warning that "AN INVESTMENT IN THE TRUST IS ILLIQUID AND INVOLVES SIGNIFICANT RISKS AND THUS IS NOT A SUITABLE INVESTMENT FOR ALL PROSPECTIVE INVESTORS."

**9.** Ridgewood's January 3, 1994 Selling Agreement with Delta actually stated that Delta was an independent contractor, and that "nothing herein shall be construed as creating a relationship of partners, affiliates, joint venturers, or employer and employee[.]"

quid and restricted to accredited investors.[10] We therefore reach the identical conclusion that the circuit court properly granted summary judgment on the claims arising from Brooks' vicarious liability theories.[11]

Ridgewood apparently had less direct contact with Keating than Euclid. Brooks nevertheless cites deposition testimony from a Ridgewood employee in the *Schweizer* case as evidence of a direct relationship from which an agency inference can be drawn. But that testimony merely shows that Ridgewood's representative met with Keating to present the investment opportunity to him as "a program worth considering for [his] high net worth individual clients[.]" According to the Ridgewood representative, Keating "was instructed, only accredited investors could get a copy of this confidential [offering] memorandum." Although the Ridgewood representative also "did an investor meeting back in" May 1995, it was for what he understood to be "potential investors[.]"

■ We are not persuaded that this evidence raises an inference of an actual or implied agency relationship. First, nothing that occurred during these direct contacts changed the contractual nature of the relationship between Ridgewood and Delta. Second, even though Keating hosted a seminar featuring Ridgewood speakers and written materials, there is absolutely no evidence that Brooks attended or knew about that meeting, which apparently occurred at least seven months

---

**10.** Brooks signed the final page of the Subscription Agreement, which states that he "understands" that Ridgewood "will be relying on the accuracy and completeness of the responses to the foregoing questions and represents and warrants .... [that] [t]he answers ... and the information provided herein[ ] are complete and correct and may be relied upon by [Ridgewood] in determining whether the undersigned has met the suitability requirements set forth in the" Offering Memorandum. In addition, this same acknowledgment stated that Brooks "has no need for liquidity in the Shares," and that he "could afford a complete loss of such an investment[.]"

**11.** Ridgewood offers a "dual agency" rationale as alternative grounds for affirming the circuit court. We will not address that argument because the trial court did not address it. In any event, our holding and rationale makes it unnecessary to do so.

before Keating made his investment in Ridgewood. To the contrary, Brooks testified in his deposition that he first met Keating several months after that meeting, in July of 1995, and that they did not discuss Ridgewood as an investment until sometime after he finished working at Baltimore Aircoil on August 31. Thus, there is nothing to suggest that Brooks mistakenly perceived that Keating or Delta were authorized agents for Ridgewood.

As for the nondisclosure claim, we must vacate the judgments on Counts I and II because the circuit court's erroneous ruling that there were no allegations of materially misleading nondisclosures covered all three Issuers. We remand with the same observations that we made with respect to Brooks' nondisclosure claims against Euclid.

We shall affirm the judgment on the Count III negligence claim for the same reasons we affirmed the judgment on Brooks' negligence claim against Euclid.

### III.

### Cyclean

Cyclean recycled used asphalt through proprietary technology, and planned to re-sell the recycled product to municipalities and private contractors. Cyclean paid Brooks distributions in 1996 and 1997, totaling $1,705.48.

Brooks' arguments on the agency, nondisclosure, and negligence questions do not distinguish any of the documentary evidence relating to Cyclean from the analogous documents governing the Euclid and Ridgewood relationships.[12] Brooks admits that he signed a Note Purchase Agreement indicating that he had "a net worth (exclusive of home, home furnishings and automobiles) of $500,000." He also acknowledges that

---

12. Cyclean had a selling agreement that identified Delta as a "Selected Selling Agent" and defined its "relationship with Cyclean ... as an independent contractor." The substantive terms of the agreement closely resemble the selling agreements that Euclid and Ridgewood had with Delta.

Cyclean included specific warnings about the nature of the investment in its private placement memorandum.[13]

Our prior discussion of these common issues answers Brooks' arguments with respect to Cyclean. We shall not address Cyclean's alternative defenses of contributory negligence and statute of limitations because the circuit court did not grant judgment on the basis of those defenses.

**JUDGMENTS IN FAVOR OF EUCLID, RIDGEWOOD, AND CYCLEAN ON COUNTS I AND II VACATED, AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. JUDGMENTS AFFIRMED IN ALL OTHER RESPECTS. COSTS TO BE PAID 3/4 BY APPELLANT, 1/4 BY APPELLEES, JOINTLY AND SEVERALLY.**

13. The cover page of Cyclean's private placement memorandum stated: THE SECURITIES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK AND SHOULD NOT BE PURCHASED BY ANYONE WHO CANNOT AFFORD THE LOSS OF THE ENTIRE INVESTMENT. SEE "RISK FACTORS." Among the enumerated risk factors were that Cyclean had been "operat[ing] at a loss every quarter since its inception" and expected to continue doing so, that Cyclean was "dependent on a single customer ... for all of its operating revenues" and that "management believe[d] that [Cyclean] [would] be at a disadvantage in comparison to larger companies with greater marketing and financial resources."